Eric STEINER, Petitioner,

v.

MINNESOTA LIFE INSURANCE COM-
PANY, a foreign corporation; Tim
Schloesser; and Larry Norlin, Respon-
dents.

No. 03SC084.

Supreme Court of Colorado,
En Banc.

Feb. 23, 2004.

Salmon, Lampert & Clor, P.C., Brian J. Lampert, Greenwood Village, Colorado, Attorney for Petitioner.

Welborn Sullivan Meck & Tooley, William R. Rapson, Stephen A. Bain, Denver, Colorado, for Respondent Minnesota Life Insurance Company.

Cockrell, Quinn & Creighton, Richard M. Foster, Denver, Colorado, for Respondents Tim Schloesser and Larry Norlin.

Justice RICE delivered the Opinion of the Court.

The Petitioner, Eric Steiner, seeks review of a court of appeals decision affirming the trial court's dismissal of his case. *See Steiner v. Minnesota Life,* 71 P.3d 1017 (Colo.App. 2003). The Petitioner had brought suit against Minnesota Life Insurance Company ("Minnesota Life") and two of its agents for breach of contract, bad faith, and outrageous conduct arising out of Minnesota Life's refusal to continue paying disability benefits.[1] Prior to trial, the Petitioner refused to answer certain questions regarding his underlying disability, invoking his Fifth Amendment privilege against self-incrimination in response to approximately forty questions. Ultimately, the trial court dismissed the Petitioner's claims based on his refusal to answer those questions. The court of appeals upheld that dismissal, ruling that "plaintiff's refusal

to answer the deposition questions directly blocked the discovery relevant to the resolution of this dispute, and dismissal is an appropriate remedy." *Steiner,* 71 P.3d at 1021.

We granted certiorari on the issue of whether the court of appeals applied the wrong constitutional standard in affirming the dismissal of the Petitioner's claims after his invocation of the privilege against self-incrimination. We find that both the trial court and the court of appeals erred in failing to properly balance the Petitioner's constitutional privilege against self-incrimination against Minnesota Life's right to adequately defend itself. We now hold that, prior to determining what consequence will flow from a plaintiff's invocation of the privilege, a trial court must consider the defendant's need for the information withheld, whether the defendant has any alternative means of obtaining that information, and whether any effective remedy, short of dismissal, is available to safeguard both parties' interests.

Thus, we now reverse the court of appeals' decision and remand this case to the court of appeals with directions to reinstate the Petitioner's case before the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

### A. The Disability Policy

The Petitioner was an anesthesiologist who, in 1991, obtained a disability insurance policy (the "Policy") from Minnesota Life which provided an "occupational-specific benefit." The Policy provided for the payment of a monthly income benefit of $13,384 if the Petitioner became disabled, such that he could not practice anesthesiology, for the duration of the disability. In 1998, the Petitioner became disabled with an alcohol and narcotic addiction,[2] along with a panic disorder, and was therefore unable to continue practicing as an anesthesiologist.

---

1. The two agents were sued based on alleged misrepresentations they made in issuing the insurance policy to the Petitioner. Throughout the proceedings leading to this appeal, the agents essentially joined Minnesota Life on its various motions, without initiating any additional motions. For the purpose of convenience, this opinion will refer to Minnesota Life as the primary defendant in the case below.

2. In particular, the Petitioner had developed an addiction to Sufenta and Percocet, two narcotics frequently dispensed by anesthesiologists in the course of practice.

The Petitioner underwent treatment for his addiction and filed a claim with Minnesota Life under the Policy. Minnesota Life paid out benefits for several months, but in June 1999 Minnesota Life discontinued payments based on its determination that the Petitioner was no longer disabled under the terms of the Policy. Rather, because the Petitioner's addiction was "in remission" and his panic disorder was "not disabling at [that] time," Minnesota Life concluded that the Petitioner could in fact return to practice as an anesthesiologist. Following the termination of benefits, the Petitioner's own treating physicians sent repeated letters to Minnesota Life, reiterating their medical opinion that the Petitioner "remain[ed] disabled by his panic disorder and his substance dependence with respect to the practice of anesthesiology." Despite this information, Minnesota Life refused to reinstate the Petitioner's disability benefits. Consequently, the Petitioner filed suit, alleging under both contract and tort theories that his continuing panic disorder and drug addiction, with its high risk of relapse, rendered him permanently unable to work as an anesthesiologist and that he therefore was entitled to continued disability benefits under the Policy.

## B. Discovery Dispute

Prior to trial, Minnesota Life deposed the Petitioner regarding various aspects of his drug addition, including the particular circumstances under which he had abused narcotics. The Petitioner answered dozens of questions regarding his personal background, his panic attack disorder, his drug treatment experience, the prognosis given by his physicians regarding his future inability to work in anesthesiology, and his understanding of his coverage under the Policy. Additionally, the Petitioner answered a series of questions regarding the nature of his drug addiction, how and when the addiction began and developed, and the particular drugs to which he was addicted. However, of the approximately 125 questions directly addressing the Petitioner's drug addiction, the Petitioner refused to answer about 40 questions on Fifth Amendment grounds. Specifically, the following questions are typical of those which the Petitioner refused to answer:

Q: Where? What hospital [were you at when you first took the Sufenta]?

Q: What was the amount of the Sufenta?

Q: Where did you obtain the Sufenta?

Q: And [you took the Sufenta] during the course of an operation?

Q: How did you get the drugs?

Q: Did you steal the drugs?

Q: Did you use a syringe to take the drugs?

Q: What was the dosage of the Sufenta?

Q: Did you have the permission of anyone to take the Sufenta?

Q: What impact did the Sufenta have on your patients?

Q: How many times a day would you take Sufenta on those occasions between November '97 and May '98?

Q: [W]hat efforts did you make over that same period of time to cover up the fact that you were taking Sufenta?

Based on his fear of exposing himself to criminal liability, the Petitioner refused to answer those questions which tended to show that he had stolen the narcotics, that he had practiced anesthesiology while under the influence of narcotics, or that he had endangered patients' lives while taking narcotics. The Petitioner also declined to answer questions geared at his knowledge of the illegality of the alleged acts, including whether he knew that it was a felony to take Sufenta illegally and whether he would still take illegal drugs despite a knowledge that it might result in incarceration.

Shortly after the deposition, Minnesota Life moved for summary judgment based on the Petitioner's refusal to answer certain questions regarding his history of drug abuse. In support of its motion, Minnesota Life asserted that the Petitioner's "refusal to answer questions relating to the amounts, frequency and manner of his use of drugs severely prejudice[d] Minnesota Life's ability to prepare a defense of this case." In his response to the summary judgment motion, the Petitioner asked that the trial court adopt a balancing approach to his invocation of the Fifth Amendment, wherein the court would evaluate the defendant's need for the

information, the defendant's ability to obtain the pertinent information through other means, and whether any adequate alternative to dismissal was available.

The Petitioner argued that the information sought—including whether he had taken the narcotics while practicing with patients and whether he had stolen the narcotics—was not directly relevant to whether he suffered a disability which rendered him unable to practice as an anesthesiologist. Rather, the Petitioner argued that his disability claim rested solely on the fact of his addiction and the danger for relapse when placed in a high stress environment with ready access to the narcotics. The Petitioner noted that because he had responded to the majority of questions asked and had provided Minnesota Life with copies of his medical records which detailed the nature and extent of his narcotic addiction, Minnesota Life was not sufficiently hampered in its defense of the claim so as to warrant dismissal. Additionally, the Petitioner offered to provide the requested information to the court for an in camera review in order to allow the court to evaluate Minnesota Life's need for the information.[3] Thus, the Petitioner concluded that because Minnesota Life had not been deprived of any information which was material to its ability to defend itself and because Minnesota Life had several other means of obtaining pertinent information regarding the Petitioner's drug addiction, dismissal was therefore not warranted at this stage of the litigation. Alternatively, the Petitioner suggested that the court might turn the motion for summary judgment into a motion to compel, thereby allowing the Petitioner an opportunity to answer the questions or face dismissal based on his refusal.

On April 10, 2001, the trial court converted Minnesota Life's motion for summary judgment into a motion to compel, which it simultaneously granted, ordering the Petitioner to appear for another deposition and to answer the disputed questions or face dismissal with prejudice. As the basis for its ruling, the trial court stated the following:

Simply put, the "how, and the how often" as well as the "why and the what ifs" of his addictions and anxieties are directly relevant to the claims as well as to the defenses and are, at a minimum, critical to defense preparation for trial, including for the purposes of impeachment. Plaintiff's arguments in opposing this discoverable information request the Court to make determinations which are inappropriate at this stage, i.e., to weigh the disputed evidence; to accept one expert's qualifications over that of another expert, etc; the Court declines to do so. Neither is the Court persuaded that Defendant essentially has everything it needs by what it has already obtained through the disclosure and discovery to date.

Thus, the trial court determined that the withheld information was in fact relevant to Minnesota Life's defense, although it made no additional findings regarding the Petitioner's Fifth Amendment privilege against self-incrimination or the availability of less burdensome remedies. Consequently, the trial court ordered the Petitioner to answer the disputed questions or face dismissal. However, the trial court did grant the Petitioner's subsequent motion to stay proceedings pending appeal of the trial court's order to this court under C.A.R. 21. We denied his Petition for Writ of Prohibition and Writ of Mandamus on May 29, 2001, resulting in another order from the trial court that the Petitioner submit to the deposition and answer questions regarding the details of his drug abuse.

Less than a week before his second deposition was scheduled to occur, the Petitioner filed a motion for a protective order with the trial court, requesting that any answers to the disputed questions given at the impending deposition be prohibited from disclosure outside the parties of the case. At the deposition on July 3, 2001, the Petitioner refused to answer questions until the court ruled on his motion for the protective order. That day, a telephonic conference was conducted wherein the trial judge heard argument from both parties on the issue and then denied the

---

3. Although it is unclear if the Petitioner offered this information solely for a relevancy determination or specifically for a Fifth Amendment determination, the two issues are sufficiently overlapping that the trial court could have used the information for both purposes.

Petitioner's motion for a protective order based on her finding that she had "not been presented with any legal or factual grounds which would make it appropriate to enter this order." The trial judge further stated, "I would note that Dr. Steiner has brought this case. For any plaintiff to bring a case necessarily involves some scrutiny in that they are a matter of public record."

Based on the trial judge's ruling, the Petitioner refused to continue with the deposition and again filed with this court a Petition for Writ of Prohibition and Writ of Mandamus, seeking review of the trial court's refusal to grant a protective order. While that petition was pending, the trial court granted Minnesota Life's motion to dismiss based on the Petitioner's continuing refusal to answer certain questions regarding his drug abuse, rendering his second Petition with this court moot.

In September 2002, the Petitioner appealed that dismissal to the court of appeals, arguing that the trial court violated his Fifth Amendment rights when it dismissed his claim based on his invocation of the privilege against self-incrimination.[4] Noting that it "review[s] such discovery rulings for abuse of discretion," the court of appeals affirmed the trial court's dismissal. *Steiner v. Minnesota Life Ins. Co.*, 71 P.3d 1017, 1020–22 (Colo. App.2003). The court of appeals acknowledged the Petitioner's right to invoke the Fifth Amendment in a civil proceeding, even in pre-trial discovery, and found that the Petitioner had properly invoked the privilege insofar as he had not yet incriminated himself regarding the means by which he had acquired the narcotics. *Id.* at 1021. Nevertheless, the court of appeals concluded that the Petitioner's "refusal to answer the deposition questions directly blocked the discovery relevant to the resolution of the dispute, and dismissal is an appropriate remedy." *Id.*

In upholding the trial court's dismissal, the court of appeals engaged in little analysis regarding the competing constitutional rights of a plaintiff to assert his Fifth Amendment

privilege and of a defendant to prepare his defense. Because we find that both the trial court and the court of appeals failed to apply the appropriate standards to the constitutional dilemma posed, we now reverse the dismissal.

## II. Discussion

### A. Fifth Amendment's Applicability to Civil Cases

At issue in this case is the tension between C.R.C.P. 26(b)(1), which provides that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party," and the Fifth Amendment, which protects a person from having to testify in any way which might tend to subject himself to criminal liability. U.S. Const. amend. V; *see also Hoffman v. U.S.*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) ("The privilege afforded not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."). We begin by noting that the issue of whether a plaintiff's claims may be dismissed based on his proper invocation of the privilege against self-incrimination is a matter of first impression for this court. However, based on the Fifth Amendment jurisprudence of the United States Supreme Court, as well as the guidance provided by the several other courts who have addressed similar issues to that before us today, we now adopt the balancing approach which has become the majority rule across the country.

Although the Fifth Amendment provides only that "no person ... shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, the privilege against self-incrimination has long been applied in the civil context. *See McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924) ("The privilege

---

4. The court of appeals also addressed issues not pertinent here, including its analysis of whether the Petitioner was entitled to a protective order under the dictates of *Martinelli v. Dist. Court*, 199 Colo. 163, 170, 612 P.2d 1083, 1088 (Colo.

1980), and whether the trial court's award of costs to Minnesota Life impermissibly burdened the Petitioner's exercise of his Fifth Amendment privilege. *Steiner v. Minnesota Life Ins. Co.*, 71 P.3d 1017 (Colo.App.2003).

is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it."). Moreover, even a plaintiff in a civil case may invoke that privilege, and does not surrender his constitutional right merely by the filing of an action. *See McMullen v. Bay Ship Management*, 335 F.3d 215, 218 (3d. Cir.2003) (" 'It is inconceivable that by exercising the constitutional right to bring or defend an action a person waives his or her constitutional right not to be a witness against himself or herself, and no case has so held.' ") (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2018 (2d ed.1994)). Rather, the issue before us today is the impact of a plaintiff's proper invocation of the privilege upon the underlying litigation.

The United States Supreme Court has repeatedly stressed that the privilege against self-incrimination is one which should be exercised without penalty, and that courts should avoid "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.' " *Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (quoting *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). On the other hand, a civil defendant is entitled to the information necessary to adequately prepare his defense and refute the underlying claim. *See, e.g., Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir.1996) (declaring that, in a civil proceeding, "one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding"). Thus, at issue in this case is the appropriate balance to be struck between a plaintiff's constitutional privilege against self-incrimination and a defendant's right to adequately defend the claim brought against him.

Courts struggling with this dilemma have reached varying results. In the earlier cases, courts were more willing to dismiss a case where a plaintiff claimed the privilege against self-incrimination. *See, e.g., Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir.1969)

(upholding the dismissal of a plaintiff's civil rights claims based on her "continued and unyielding refusal to submit herself to any depositional interrogation or discovery whatsoever in relation to her claims"); *Kisting v. Westchester Fire Ins. Co.*, 290 F.Supp. 141, 149 (W.D.Wis.1968) ("A plaintiff in a civil action who exercises his privilege against self-incrimination to refuse to answer questions pertinent to the issues involved will have his complaint dismissed upon timely motion.").

Under the more recent approach, however, the majority of jurisdictions have adopted a test which balances the competing rights of a plaintiff to exercise his privilege against self-incrimination and of a defendant to adequately defend the claim brought against him. *E.g., McMullen v. Bay Ship Mgmt.*, 335 F.3d 215 (3d Cir.2003)(reversing dismissal as improper based upon the plaintiff's invocation of the privilege against self-incrimination because the trial court had failed to consider less severe sanctions); *Serafino v. Hasbro*, 82 F.3d 515 (1st Cir.1996) (upholding the dismissal of an employee's retaliation action based upon his invocation of the privilege against self-incrimination because the employer had a substantial need for the withheld information, there was no less burdensome means of obtaining the information, and there was no adequate alternative to dismissal); *United States v. 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83–4 (2d Cir.1995) (noting in a civil forfeiture action that "*all* parties—those who invoke the Fifth Amendment privilege and those who oppose them—should be afforded every reasonable opportunity to litigate a civil case fully and [that] exercise of Fifth Amendment rights should not be made unnecessarily costly") (emphasis in original)(internal citations omitted); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084 (5th Cir.1979) (holding that when a plaintiff's silence is guaranteed under the Fifth Amendment, dismissal of his civil action is appropriate only when other, less burdensome remedies would be ineffective in preventing unfairness to the defendant); *Campbell v. Gerrans*, 592 F.2d 1054 (9th Cir.1979) (holding that the trial court abused its discretion when it dismissed the plaintiffs' case based on their refusal to an-

swer 4 out of 34 interrogatories on Fifth Amendment grounds).

■ We agree with the modern trend which requires that "[a] trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment." *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir.1994). In joining the majority approach, we note the constitutional imperative that a person's privilege against self-incrimination not be too costly, while also acknowledging that such a privilege must not be wielded to unfair advantage over a defendant seeking to defeat a claim brought against him. We therefore hold that where a plaintiff properly invokes the privilege against self-incrimination,[5] either prior to or during trial, a trial court must engage in a three-part balancing test before determining what adverse consequences, if any, will flow from that invocation.

■ Specifically, when confronted with the tension between the plaintiff's invocation of the privilege and the defendant's need for discovery, a trial court must determine: (1) whether the defendant has a substantial need for the information withheld; (2) whether the defendant has an alternative means of obtaining the information; and (3) whether any effective, alternative remedy, short of dismissal, is available. In applying the third prong of this analysis, the trial court must ensure that "the detriment to the party asserting [the privilege is] no more than is necessary to prevent unfair and unnecessary prejudice to the other side." *Graystone Nash*, 25 F.3d at 192.

The appropriate remedy will of course depend upon the facts and circumstances of each case. In some instances, courts have found it proper to impose a stay of the civil proceeding until the parallel criminal proceeding has completed. *E.g., McMullen v. Bay Ship Management*, 335 F.3d 215, 219 (3d Cir.2003) (reversing a trial court's dismissal where both parties had suggested that the case be stayed until plaintiff "[was] no longer under the cloud of criminal prosecution"). In other cases, courts have found that allowing the factfinder to draw an adverse inference from the party's silence substantially levels the playing field for the opposing party. *See, e.g., S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir.1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof."). The Fourth Circuit has offered a myriad of alternatives which help ensure the fairness of the proceeding while preserving a civil litigant's right to invoke the Fifth Amendment. *In re Grand Jury Subpoena*, 836 F.2d 1468, 1476–77 (4th Cir.1988) (holding that a civil protective order did not substitute for the invocation of the privilege against self-incrimination). In addition to the options already listed, the court suggested that, at least in some cases, a trial court might shift the burden of proof in order to place the burden "on the party who is in the best position to provide relevant proof." *Id.* at 1476. In other cases, a trial court might exclude testimony at trial which would waive the privilege previously invoked during discovery in order to prevent abuse of the privilege as a means of "thwarting discovery." *Id.* at 1477.

Notably, one approach which generally has been rejected as an effective remedy is the issuance of a civil protective order. *See id.* at 1474–75; *In re Grand Jury*, 286 F.3d 153,

---

5. As a threshold matter, a trial court must necessarily determine if the privilege is properly invoked. In other words, the information withheld must be of the sort which could, directly or indirectly, subject the plaintiff to the possibility of prosecution. *See, e.g., Kastigar v. U.S.*, 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (noting that the Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used"). As such, a plaintiff must invoke the privilege in response to specific questions, and the trial court must determine whether the privilege has been properly invoked as to each question. Here, the Petitioner properly invoked the privilege as to questions detailing how he obtained the narcotics and whether he used them in a way as to endanger patients, as he had not previously incriminated himself on those issues. However, the Petitioner's invocation of the privilege was improper as to his mere knowledge of whether the use or stealing of narcotics was illegal, as that knowledge alone could not subject the Petitioner to prosecution.

162 (3d Cir.2003) (holding that, "[i]n the vast majority of cases, a protective order should yield to a grand jury subpoena"); *In re Grand Jury Subpoena Served on Meserve, Mumper & Hughes*, 62 F.3d 1222, 1226 (adopting a per se rule that a grand jury subpoena trumps a civil protective order); *In re Grand Jury Proceedings (Williams)*, 995 F.2d 1013, 1015 (11th Cir.1993) (adopting the per se rule that a civil protective order may never "shield a deposition given in a civil suit from a subsequent federal grand jury subpoena"); *but see In re Grand Jury*, 945 F.2d 1221 (2d Cir.1991) (requiring the government to "show improvidence in the original grant of the protective order or compelling need or extraordinary circumstances that would justify allowing the government access to the depositions" in order for the grand jury subpoena to overcome a civil protective order). A civil protective order has been held inadequate to preserve a party's Fifth Amendment privilege because "an individual may not totally rely on judicial protection against the use of incriminating information without a grant of immunity." *In re Grand Jury Subpoena*, 836 F.2d at 1476–78 (noting that "[the executive department] alone, has the right to determine whether to immunize a witness"). The risks posed by relying on a protective order include the danger that parties will leak the sealed information or materials to law enforcement authorities, the possibility that the order will be modified under Rule 26, and the likelihood that information sealed by the order throughout the discovery process will eventually be disclosed at the public trial. *Id.* As such, a civil party or witness who relies on a protective order when providing incriminating information has waived his privilege against incrimination without any meaningful guarantee that the information will not be used against him. Given the inadequacy of a civil protective order, then, trial courts must consider some of the other available alternatives to dismissal when engaging in the balancing test set forth today.

Thus, although a trial court retains significant discretion in fashioning the appropriate remedy for a plaintiff's refusal to answer specific questions based on the privilege against self-incrimination, the court must consider whether effective alternative remedies, less severe than dismissal, are available. *See Graystone Nash*, 25 F.3d at 194 ("The imposition of an appropriate remedy is within the discretion of the trial court. When significant factors are not weighed in making that determination, however, we must remand so that a proper evaluation may be reached.") With these principles in mind, we turn to the proceedings below.

## B. The Proceedings Below

■ The trial court dismissed the Petitioner's case based on its finding that "Plaintiff has willfully refused to comply with the Court's April 10, 2001 Order [to answer the disputed questions at a second deposition] unless he receives a protective order; the Court's April 10th Order was neither conditional nor subject to such qualification by Plaintiff." In discussing its refusal to issue a protective order, the trial court further noted that it had "not been provided with any indication that a criminal prosecution or investigation upon the same facts is underway or even contemplated...." Given the Petitioner's refusal to answer the disputed questions in the absence of a protective order, which the trial court deemed unmerited,[6] the trial court felt compelled to dismiss the Petitioner's case with prejudice.

■ In reaching its decision, the trial court failed to engage in any analysis as to the validity of the Petitioner's Fifth Amendment claims or the availability of any remedy short of dismissal. In fact, to the extent it relied upon the nonexistence of any criminal investigation into the Petitioner's illegal use or acquisition of narcotics, the trial court misconstrued the scope of the Fifth Amendment privilege. The right not to incriminate oneself is not triggered solely by the existence or even likelihood of a criminal prosecution; rather, "[w]hen a witness can demonstrate any possibility of prosecution which is

6. Of course, given the inadequacy of protective orders as discussed above, as well as Minnesota Life's suggestion, both in its written briefs and at oral argument, that it would be forced to turn over any incriminating evidence to the authorities, the trial court properly rejected the Petitioner's motion for a protective order.

more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster." *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir.1979); *see also Hoffman v. U.S.*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (the Fifth Amendment privilege covers even information which would provide "a link in the chain of evidence" needed for criminal prosecution). Thus, the trial court effectively passed over the threshold issue of whether the Petitioner properly invoked his privilege against self-incrimination.

Having failed to recognize the full scope of the constitutional issue before it, the trial court further overlooked the need to engage in any balancing of the Petitioner's Fifth Amendment rights against Minnesota Life's right to defend itself. As such, the trial court did not consider any remedies short of dismissal, such as allowing a negative inference to be drawn from the Petitioner's refusal to answer questions, issuing a stay of discovery until the applicable statute of limitations had run on the Petitioner's potential criminal activity, or any of the other possibilities discussed above.

## III. Conclusion

Because we find that the trial court erred in dismissing the Petitioner's case without applying the balancing test which has become the modern majority rule, we reverse the court of appeals' decision insofar as it upholds that dismissal. We therefore remand this case to the court of appeals with instructions to reinstate the Petitioner's case with the trial court for proceedings consistent with this opinion.

Justice COATS concurs in the judgment only.

Justice COATS, concurring in the judgment only.

I too would reverse the trial court's order of dismissal; however, unlike the majority, I do not consider it to be within the discretion of any court to dismiss a person's lawsuit for refusing to incriminate himself, no matter how significant his testimony may have been to the proceeding. The constitutional privilege against self-incrimination is not a qualified privilege, the exercise of which may be limited or burdened on the basis of its impact on an adverse party. Furthermore, I strongly disagree with the suggestion that a majority of courts considering the matter hold otherwise. The extreme minority of courts approving the dismissal of an invoking party's claims in order to protect the interests of another have, in my view, simply failed to consider or correctly apply the controlling precedents of the Supreme Court, much like the majority does today.

It is beyond dispute that the privilege against self-incrimination, guaranteed by the Fifth and Fourteenth Amendments, applies to civil as well as criminal proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). Unlike the criminal context, in which the defendant's criminality and a state-imposed sanction are the ultimate matters at issue, however, in the civil context the constitutional privilege does not extend so far as to protect an invoking party from inferences that may logically be drawn from its exercise. *See Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). It has long been recognized that standing silent in certain circumstances, including in the face of an accusation of criminal conduct, may give rise to an inference of guilt. *See Id.; S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994). In a civil proceeding, such an inference is permissible, where appropriate, not as a sanction or remedy for any unfairness created by exercise of the privilege but simply because it is relevant and outside the scope of the privilege. *See Baxter*, 425 U.S. 308, 96 S.Ct. 1551.

Exercise of the privilege in the civil context is not without other disadvantages as well. Without giving testimony that effectively waives the privilege, a civil plaintiff may well find himself unable to carry his burden of proof. Because exercise of the privilege against self-incrimination in no way limits the court's authority (or obligation) to manage the case fairly and efficiently, a number of courts have held that any attempt to waive the privilege, as it becomes advantageous or even necessary to maintain a

claim—either at trial or in order to defend against pre-trial motions—must be considered in light of the unfairness created by such a belated waiver. *See United States v. 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78 (2d Cir.1995); *Graystone Nash Inc.*, 25 F.3d 187 (3d Cir.1994); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282 (D.Minn. 1985). Because the privilege is constitutionally based, detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side, but a party asserting the privilege has no absolute right to subsequently waive it, and trial courts must carefully balance his interests against an adversary's entitlement to equitable treatment. *See Graystone Nash Inc.*, 25 F.3d at 192.

Because C.R.C.P 26 does not require disclosure of privileged material, it is at least clear that proper exercise of the privilege against self-incrimination cannot amount to a discovery violation in the first instance and therefore cannot implicate either an order to compel or sanctions permitted by C.R.C.P. 37. *Graystone Nash Inc.*, 25 F.3d at 191; *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 (5th Cir.1980); *Campbell v. Gerrans*, 592 F.2d 1054, 1056 (9th Cir. 1979). Whether burdens imposed on the exercise of the privilege are referred to as "sanctions" or merely as "remedies" to prevent inherent unfairness, the view that having selected the litigation process, a plaintiff may not use the privilege to advance his cause—to use it as a sword rather than a shield—is an "approach ... that has not carried the day." *McMullen v. Bay Ship Mgmt.*, 335 F.3d 215, 218 (3d Cir.2003).

By my count, the "modern trend," maj. op. at 140, or "more recent approach," maj. op. at 141, referred to by the majority, consists of only one case from the First Circuit Court of Appeals, *see Serafino v. Hasbro, Inc.*, 82 F.3d 515 (1st Cir.1996), which relies on the now largely discredited approach of the Fifth Circuit, *see Wehling*, 608 F.2d 1084, and a misreading of other modern cases. In contradistinction to this "approach," it is clear, at least to me, that both the Second and Third Circuit cases relied upon by the majority, *see McMullen*, 335 F.3d 215; *4003–4005*

*5th Ave., Brooklyn, N.Y.*, 55 F.3d 78; *Graystone Nash Inc.*, 25 F.3d 187, merely stand for the proposition that a balance is required before a party may be permitted to change his mind and belatedly waive the privilege. The Third Circuit in *McMullen* expressly distinguishes *Serafino*, which had been relied on by the district court being reviewed, and holds that the case is controlled by *Graystone* instead. Similarly, the Ninth Circuit, in *Campbell*, 592 F.2d 1054, *see* maj. op. at 141, explains *Lyons v. Johnson*, 415 F.2d 540 (9th Cir.1969), *see* maj. op. at 140, as a case in which the privilege was not properly invoked in the first place and therefore refusal to answer was appropriately subject to Rule 37 sanctions, *Campbell*, 592 F.2d at 1057, and it expressly holds it to be "obvious that dismissal of an action is costly and therefore would not survive the *Griffin* test," *id.* at 1058, prohibiting any penalty for exercising the privilege against self-incrimination.

The privilege against self-incrimination is no more relative to an opponent's need for the undisclosed information than is any statutorily created privilege, *see Clark v. Dist. Ct., Second Judicial Dist., City and County of Denver*, 668 P.2d 3, 9 (1983), and courts have no more authority to penalize its exercise than the exercise of any other absolute privilege. Courts must determine whether the privilege against self-incrimination has been properly invoked, whether it has been (or may even permissibly be) waived, and what inferences may logically be drawn from its exercise. While logical inferences arising from the exercise of the privilege are not barred in civil proceedings, and a court must exercise its discretion to insure that an invoking party may not acquire an unfair advantage by belated waiver, an opposing party has no right to a properly invoking party's testimony, no matter how advantageous it might be for the defense. The disadvantage to another party resulting from the privilege against self-incrimination is among the inherent costs associated with any such policy choice and is not a matter to be "remedied" by imposing a penalty—like dismissal of a party's lawsuit—upon exercise of that right.

Because I believe the majority, in much the same way as the First Circuit upon which

it relies, fundamentally misperceives the nature of the constitutional privilege against self-incrimination, I do not join its opinion. Because I agree, however, that it correctly reverses the court of appeals opinion upholding the trial court's dismissal, I concur in the judgment of the court.