**CAMP BIRD COLORADO, INC.,**
a Colorado corporation,
Plaintiff–Appellant,

v.

**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF OURAY, Colorado,**
Defendant–Appellee.

No. 08CA0852.

Colorado Court of Appeals,
Div. I.

July 23, 2009.

Dufford & Brown, P.C., Christian D. Hammond, Joanne Herlihy, Denver, Colorado, for Plaintiff–Appellant.

Mary E. Deganhart, County Attorney, Ridgway, Colorado, for Defendant–Appellee.

Opinion by Judge ROY.

Camp Bird Colorado, Inc. (the mining company) appeals a judgment quieting title in the Board of County Commissioners of the County of Ouray (the county) to a public right-of-way (the road segment) traversing five mining claims owned by the mining company. The mining company maintains the road segment is private. We affirm but on grounds different from those relied upon by the trial court.

More specifically, because we conclude the public accepted the federal grant of a public right-of-way on the public domain under a federal statute, R.S. 2477, we do not address the trial court's conclusion that the public obtained ownership of the right-of-way through adverse possession of private property and related arguments.

County Road 361 proceeds southwest out of Ouray, Colorado. Approximately 4.3 miles southwest of Ouray, it forks, and, according to a 1961 county road map, County Road 361 bears left to a bridge over Sneffels Creek and the other fork becomes County Road 26 and proceeds west to Sneffels; one fork then proceeds up to Yankee Boy Basin and over Blue Lake Pass while the other fork proceeds to the Humboldt Mine on Mendota Peak.

The road segment begins at the south end of the bridge over Sneffels Creek, which was built and is maintained by the county. It then proceeds generally south up Imogene Gulch, loosely paralleling Imogene Creek, and connects to a forest service road, which proceeds to the upper level of the Camp Bird Mine as a road, then on to Imogene Basin, and over Imogene Pass as a trail. When we say "loosely paralleling Imogene Creek," we refer to the lower portion of the road segment that makes a 650–foot open loop to the west to take advantage of relatively flat terrain.

The forest service road, prior to intersecting with the road segment, begins just east of Sneffels and proceeds east-south-east to the intersection, a distance of approximately 1.1 miles, and is the road the mining company claims is the intended public road. The road segment provides a much shorter and steeper route to the intersection than that provided by the forest service road and was used by the mining company as a route from its mill and lower level of the mine to the upper levels of the mine.

The road segment (1) enters the mining company's properties on the *Emily Mill Site, Mining Survey No. (MS) 5478* and *Glen Monarch Mill Site, MS 535B;* (2) traverses the *Deadwood Mill Site, MS 12637B, the Glen Monarch Lode, MS 535A* (Glen Monarch Lode), and the *Launaka Lode, MS 8239A;* (3) encroaches on the *Launaka Mill Site, MS* 8239B; and (4) terminates on the Agnew Lode, MS 19795. *See* Appendix A. The italicized lode or mill site claims were included in a 1983 quiet title action brought by the mining company more fully discussed later.

At trial, the county put on evidence that the road segment was declared a public trail upon the public domain in 1878 and 1879, and its public use commenced in the 1870s and continued to the present. The mining company contended the county's claim was barred by the 1983 quiet title decree, the declaration of the road segment as a public road was not effective, and the road segment had not been adversely possessed by the public. The trial court, in a detailed order, concluded the 1983 quiet title decree had no preclusive effect on the county's claim, determined the road segment was a public road by adverse possession, and quieted title in the county.

On appeal, the mining company contends (1) the trial court erred in holding that the 1983 decree quieting title to claims does not bar this action; (2) the trial court erred in concluding as a factual matter that the road segment is a public road; and (3) the trial court erred in admitting some evidence.

## I. Appellate Jurisdiction

As a preliminary matter, the county contends the mining company did not timely file its notice of appeal. We disagree.

■ A notice of appeal must be filed within forty-five days of the date of the trial court's final judgment. C.A.R. 4(a). A judgment is final when it ends the action at issue and leaves nothing further for the court pronouncing the judgment to do except execute that judgment. *Baldwin v. Bright Mortgage Co.,* 757 P.2d 1072, 1073 (Colo.1988).

■ Here, the trial court's initial order, dated November 14, 2007, expressly deferred the determination of the road segment's width until a later date. In January 2008, the parties stipulated that the right-of-way for the road segment was eighteen feet in width along a surveyed route. On March 7, 2008, the trial court amended its order by incorporating this stipulation. The mining company's notice of appeal was filed on April 21, 2008, which was within forty-five days after March 7, 2008, and is, therefore, timely. C.A.R. 4(a).

## II. Claim Preclusion

The mining company contends the trial court erred in holding the county's claims are not barred by claim preclusion, or res judicata, arising from the 1983 quiet title decree. We disagree.

### A. Standard of Review

■ Claim preclusion is sometimes a strict question of law and other times a mixed question of law and fact. *Feightner v. Bank of Okla.,* 65 P.3d 624, 627 (Okla.2003). If the facts in the case are undisputed and the question of preclusion either can be answered by review of the judgment or can be determined solely by reviewing the record, it is strictly a question of law and thus reviewed de novo. *Id.; see also Satsky v. Paramount Commc'ns, Inc.,* 7 F.3d 1464, 1468–69 (10th Cir.1993). However, if there are disputed facts, then facts supported by reasonable evidence are given a deferential standard of review and application of the law is reviewed de novo. *Feightner,* 65 P.3d at 627; *see also People v. Gonzales,* 987 P.2d 239, 242 (Colo.1999) (while we defer to a trial court's findings of disputed facts, the application of a legal standard to historical fact is a matter for de novo appellate review).

### B. The 1983 Quiet Title Action

The mining company brought the 1983 quiet title action to quiet title to mining claims and mill sites it owned or leased in Ouray County or part in Ouray County and part in an adjacent county. For the leased claims or mill sites, title was to be quieted in the lessor subject to the lease.

It was a multi-faceted action involving fourteen claims for relief; a large number of named plaintiffs in individual or representative capacities; a large number of known and named defendants and their heirs if deceased or believed to be deceased; unknown persons; approximately 175 lode, placer, and mill site claims; and a wide variety of interests. The mining company and others were named party plaintiffs; the county and others were named defendants; and "All Unknown Persons who claim any Interest in the Subject Matter of this Action" also were named defendants. The State of Colorado was a named defendant as to all claims.

The county was named as a party in the fourteenth claim for relief, which involved Domingo Lode, MS 18203, Domingo No. 2 Lode, MS 18203, and the Matzanas Lode, MS 14787, claims not here pertinent, and alleged that the county might have an interest in those claims by virtue of a county treasurer's deed for unpaid taxes that was prepared and recorded because of an administrative error. Attached to the complaint were appendices that listed all the named defendants alphabetically and identified the lode or mill site claim or claims in which they were alleged to have an interest. The county was listed in the appendix only as to the Matzanas and the two Domingo claims. The county attorney acknowledged receipt of the summons and complaint, and the county filed a disclaimer as to any interest in the three claims. The 1983 decree recited this disclaimer.

The twelfth claim for relief alleged that the mining company executed and delivered a promissory note in favor of a lender and its assignee and secured payment of that promissory note with two deeds of trust on a number of claims, including those pertinent here. The complaint further alleged that the obligation had been satisfied and the deeds of trust had expired. The public trustee of the county was joined as a defendant because he or she was a non-signatory party to the deeds of trust. The lender filed a disclaimer and the assignee and the mining company entered into a stipulation defining "certain rights" of the assignee which were ultimately preserved in the decree.

## C. Analysis

 Claim preclusion bars relitigating matters that already have been decided as well as matters that could have been raised in a previous litigation but were not. *Argus Real Estate, Inc. v. E–470 Pub. Highway Auth.,* 109 P.3d 604, 608 (Colo.2005). For a claim to be precluded in subsequent litigation, the following must be present: (1) a final judgment in the first matter; (2) identity of subject matter; (3) identity of claims for relief; and (4) identity of, or privity between, the parties. *Id.* Claim preclusion bars relitigating not only all the claims actually decided in the previous action, but also all claims that might have been decided if the claims arose from the same injury. *Id.* at 609. Whether the claims or causes of action are the same is determined by the injury for which relief is demanded, not by the legal theory on which the person asserting the claim relies. *Id.*

Quiet title actions are governed by C.R.C.P. 105. The relief sought is clear title to the subject property by means of a complete adjudication of the rights of all parties to the action. C.R.C. P. 105(a); *Argus,* 109 P.3d at 609. Quiet title actions are intended to grant full relief to the party asserting an interest in the property. C.R.C.P. 105(a); *Argus,* 109 P.3d at 609.

 Colorado has a liberal notice-pleading requirement; nevertheless, a party must receive notice of the claims that will be raised at trial. *Command Commc'ns, Inc. v. Fritz Co. Inc.,* 36 P.3d 182, 187 (Colo.App.2001) (citing *Lyons v. Hoffman,* 31 Colo.App. 306, 502 P.2d 980 (1972)).

 The mining company, without citing us to any authority other than C.R.C.P. 105(a), argues that any claim by the county to a public right-of-way over the pertinent lode and mill site claims is barred because the county, a named party as to the fourteenth claim for relief, was an unknown party with an interest as to the twelfth claim for relief.

This argument is inconsistent with its general allegation in the 1983 complaint, which alleged as follows:

There are other persons who may be interested in the subject matter of this action. However, their names cannot be inserted in this Complaint because these names are unknown to the plaintiffs. These persons have been made Defendants and designated either as the heirs of a designated individual or "all unknown persons who claim any interest in the subject matter of this action." So far as Plaintiffs can ascertain, the interests of the unknown persons are derived through some one or more of the named defendants.

A reasonable person reading this language in the complaint might well conclude that the otherwise broad term "unknown persons" was, in fact, limited. It is undisputed that the county's claim of a public right-of-way over the pertinent claims is not derived through any of the other named defendants in the quiet title action.

In addition, the complaint does not, in either general or specific terms, seek to quiet title to any roads or trails, public or private, over any of the lode and mill site claims that were the subject matter of the 1983 quiet title litigation.[1]

A plaintiff in a quiet title action may omit an interest, or the holder of the interest, because challenging the interest would be futile, the plaintiff did not contemplate the interest, the plaintiff did not know of the interest, or the plaintiff did not care about the interest. *See generally G.P. Anderson, Colorado Quiet Title Actions* § 3.1.7, at 68 (2008). Further, it appears that *Lobato v. Taylor,* 70 P.3d 1152 (Colo.2003), may limit the scope of "unknown persons" in quiet title proceedings. Recognizing that the court limited the precedential value of its opinion because of the special circumstances of that case, the case may have broad implications on the scope of unknown parties in the quiet title context.

In light of the foregoing, we conclude the 1983 quiet title action and the present action do not involve identical parties or claims.

Accordingly, claim preclusion does not apply here.

### III. Sufficiency of the Acceptance of the R.S. 2477 Grant

The mining company next contends neither the county's declarations nor the use by the public were sufficient to constitute acceptance of the R.S. 2477 right-of-way grant. For the reasons set forth in this section and section IV, which relates to the Glen Monarch Lode, we disagree.

At the outset, we note there is no dispute that the roads or trails are public roads or trails before the bridge over Sneffels Creek at the north terminus of the road segment and after the intersection of the road segment and the forest service road at the south terminus of the road segment. Further, there is no dispute that the road segment was in the public domain and therefore subject to, until removed from the public domain, the public land laws of the United States.

### A. The R.S. 2477 Grant

At the time here pertinent, Revised Statute 2477, a public land law, provided: "The right of way for the construction of highways over public lands, not reserved for public uses, is granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (1866) (formerly codified at 43 U.S.C. § 932), *repealed by* Federal Land Policy Management Act, Pub.L. No. 94–579, § 706(a), 90 Stat. 2743, 2793 (1976).

The term "public domain" or "public lands" has been defined as:

> [T]hose lands that are or were subject to the public land laws of the United States. It includes land initially acquired by the United States by cession, purchase, and treaty, as well as lands acquired by other methods where the latter have been expressly declared by Congress to be public lands or public domain. "Public domain lands" are defined by the U.S. Department

---

1. For the purposes of our discussion, we assume, without deciding, that a public right-of-way over privately held land may be lost in a quiet title action in which the right-of-way is described and the public entity is named and properly joined as to that claim. We have not found any authority on this issue one way or the other.

of the Interior to be "[o]riginal public domain lands that have never left Federal ownership; also, land in Federal ownership that were obtained by the Government in exchange for public domain lands or for timber on public domain lands." 1 Rocky Mountain Mineral Law Foundation, *American Law of Mining* § 3.02[3], at 3–4, –5 (Cheryl Outerbridge ed., 2d ed.2008). Colorado courts have interpreted R.S. 2477 as an express dedication. *Sprague v. Stead,* 56 Colo. 538, 543, 139 P. 544, 545 (1914). Questions of whether and when the grant of a right-of-way is accepted by the public are matters of state law. *Barker v. Bd. of County Comm'rs,* 49 F.Supp.2d 1203, 1214 (D.Colo.1999). There are no statutorily prescribed state or federal procedures or requirements for accepting a right-of-way granted by the United States under R.S. 2477.

### B. County Declarations

▆ The mining company argues that the declarations made by the county in 1878 and 1879 are invalid because they fail to adequately define a route and they were not recorded with the county clerk and recorder so as to provide public notice.

### 1. 1878 Declaration

The 1878 declaration states:

By motion the Trail commencing about one + one quarter below Quinn + Richardson's Cabin, on Cañon Creek, and running thence over the present travelled trail to and up Imogene Basin was declared a public trail.

The trial court found that Quinn + Richardson's cabin was located at the base of the alternate route just east of Sneffels and adjacent to Sneffels Creek. One and one-half miles downstream from the cabin is the approximate location of the fork in the road at which one branch continues to Sneffels and the other branch continues to the bridge at the base of the road segment. The mining company argues that the phrase "on Cañon Creek" [2] identifies the location of the cabin.

The trial court concluded that the phrase means the fork in the road is on Cañon Creek and, as thus interpreted, clearly applies to the road leading to the bridge. Then the phrase "to and up Imogene Basin" approximately indicates a path that proceeds up Imogene Creek, of which the road segment is the lower portion. In addition, the trial court found with support in the record that, more likely than not, the road segment constructed by the mine owner in 1889 was on the trail as the topography would so dictate.

### 2. 1879 Declaration

The 1879 declaration states:

Petition of Residents of Precinct 3 concerning the establishing of a County Trail connecting the San Miguel trail with the Canon Creek trail via Imogene Gulch was presented to the Board and on motion said trail was adopted as the County Trail.

In terms of defining the route, the 1879 declaration, while in our view sufficient, is more problematic. There is no evidence as to the boundaries of "Precinct 3," and we are not aware of maps identifying either the "Cañon Creek trail" or "San Miguel trail."

However, it is undisputed that the confluence of Imogene Creek and Sneffels Creek is on the Emily Mill Site, MS 7218, one of the claims here involved, and that confluence is the headwater of Cañon Creek. County Road 361 comes up Cañon Creek from Ouray. It is also undisputed that the Emily Mill Site, MS 7218, is at or near the base of the road segment which then proceeds directly up a gulch occupied by Imogene Creek. According to the maps introduced into evidence, the ridge above is now the county line between Ouray County and San Miguel County, but, according to uncontradicted testimony, in the 1870s Ouray County extended over the ridge and included the towns of San Miguel and what is now Telluride, both on the San Miguel River. The trial court found that the maps from the earliest time periods depict

---

**2.** Cañon Creek, which is shown on current maps as "Canyon Creek," arises at the confluence of Sneffels Creek and Imogene Creek.

trails from the vicinity of Upper Camp Bird over Imogene Pass to San Miguel.

The mining company relies on *Sprague v. Stead*, 56 Colo. 538, 139 P. 544(1914), which held that public use under R.S. 2477, which we will discuss directly, requires the public use be confined to reasonably certain and definite lines such as to give entrymen and claimants notice. Here, the trial court concluded the route was sufficiently definite to give notice to subsequent entrymen and appeared on maps and drawings as early as 1877. Further, the exhibits indicate that Imogene Gulch is narrow, and the trial court found that the mountain terrain dictates the route choices.

The mining company also argues that the declarations were defective because the county did not record either the declarations or a plat accurately depicting the route of the public trail. There was a statute in effect at the time that required the county to file both the declaration and a plat with respect to roads over private land, but there is no reference in that statute to rights-of-way on the public domain. *See generally* Colo. Gen. Laws 1877, ch. 88, at 788–99. We have been unable to find, and have not been directed to, any authority which requires that a declaration by a public entity of a public road or trail over the public domain be recorded in the records of the county clerk and recorder with or without a plat identifying its route. We think it inappropriate at this late date to impose such a requirement.

Therefore, we conclude the county's declarations of a public trail or road sufficiently describe the route of the road segment, and there is no basis for concluding they, or one of them, did not effect an acceptance of the federal grant contained in R.S. 2477.

## C. Public Use

In *Leach v. Manhart*, 102 Colo. 129, 77 P.2d 652 (1938), our supreme court summarized its jurisprudence with respect to the acceptance of the R.S. 2477 grant. There, the owner of a summer hotel sued to enjoin a property owner from blocking a road that was used as a route to the hotel. The resolution of the dispute turned on whether the road was public or private. In concluding it was a public road under R.S. 2477, the court stated:

The premises considered, we think a statute of the United States enacted in 1866, Rev. St. § 2477, U.S. Comp. Stat.1916, § 4919, title 43, U.S.C.A. § 932, reading as follows: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted," is controlling. We have had occasion to consider that statute in varying situations. *See Sprague v. Stead*, 56 Colo. 538, 139 P. 544; *Greiner v. Board of County Commissioners*, 64 Colo. 584, 173 P. 719; *Dunbar v. Kohler*, 66 Colo. 272, 180 P. 739; *Nicolas v. Grassle*, 83 Colo. 536, 267[ ] P. 196, 197; *Korf v. Itten*, 64 Colo. 3, 169 P. 148. The sum of our holdings is that the statute is an express dedication of a right of way for roads over unappropriated government lands, acceptance of which by the public results from "use by those for whom it was necessary or convenient." It is not required that "work" shall be done on such a road, or that public authorities shall take action in the premises. User is the requisite element, and it may be by any who have occasion to travel over public lands, and if the use be by only one, still it suffices. "A road may be a highway though it reaches but one property owner. [citation omitted] He has a right to access to other roads and the public has a right of access to him. *Pagels v. Oak[s]*, 64 Iowa 198, 19 N.W. 905, 907. Its character is not determined by the fact that but few persons use it." Mr. Chief Justice Denison, speaking for the court in *Nicolas v. Grassle, supra*. But, it seems, where before the time when a board of county commissioners, proceeding under '35 C.S.A. c. 143, § 44, C.L.1921, § 1290, has declared a section line to be a public highway, the lands involved have been entered as homesteads, subsequent relinquishment of the entries does not operate to make effective the county board's declaration. *Korf v. Itten, supra*.

*Leach v. Manhart*, 102 Colo. at 133, 77 P.2d at 653, *quoted with approval in Brown v. Jolley*, 153 Colo. 530, 537, 387 P.2d 278, 281 (1963), *and Martino v. Bd. of County*

*Comm'rs,* 146 Colo. 143, 148, 360 P.2d 804, 805–06 (1961).

Here, the trial court made extensive and detailed findings of fact with specific citations to exhibits and testimony concerning the use of the road segment by the public commencing in the 1870s. These findings are as follows:

> During 1874, as a result of the Brunot Cession, all Ute Indian bands were removed from the San Juan Mountains by the federal government to enable extraction of minerals. The [Ute tribes] were removed to areas north, south and west of the mountains. Those [Ute tribes] to the north of Ouray were along the Uncompahgre River.

> Settlers and miners were excluded from the Ute country north of the Town of Ouray, so they could only access the Ouray mining district through the mountains from the south and east. Silverton is about twenty miles south of Ouray, and it is a significant mining district that was developed before Ouray. Lake City is about thirty miles to the east of Ouray and the Claim Office was located there.

> Miners traveled from Silverton to the Ouray mining district, especially Imogene and Yankee Boy Basins. Yankee Boy Basin is located above and to the north of Imogene Basin, up Sneffels Creek, generally on the southeast flank of Mt. Sneffels.... Miners traveling from Silverton to the Imogene and Yankee Boy Basins and to Ouray would travel from Silverton up Mineral Creek to Red Mountain Pass.

> In the Red Mountain Pass area are several trails going northwest approximately 5 miles to Imogene Pass. Just north of Red Mountain Pass at Ironton is the Richmond Trail that goes west from Ironton over Richmond Pass and ends at Imogene Creek between Upper Camp Bird and Camp Bird Number Three Level, just below Imogene Basin, allowing access south to Imogene Basin, northwest to Yankee Boy Basin, north to Camp Bird, and northeast to the town of Ouray.

> At Imogene Pass, miners and others would descend to Imogene Basin where Upper Camp Bird is located. Descending down the trail parallel to Imogene Creek, they could go to Camp Bird and then on to Ouray, or branch off before Camp Bird onto two trails that went northwest toward Yankee Boy Basin....

> The focus of mining in Ouray County during 1877–1878 was gold and silver at Yankee Boy, Imogene and Savage Basins. Ouray County was formed in 1877, but it was larger than it is today. It included that area of present day eastern San Miguel County that includes Savage Basin, the village of San Miguel, and farther below, the town of Telluride. The route from Ouray to San Miguel and Telluride was parallel to Canyon Creek, then across Sneffels Creek, then parallel to Imogene Creek up to Imogene Pass, over Imogene Pass and down Savage Creek in the Savage Basin to San Miguel, then down to Telluride. This route is relevant to determining this case. Telluride developed after Ouray and San Miguel.

> The reason the Ouray—Telluride area was settled after 1874 was mining. Access to the mines in the high country to bring in miners, supplies and equipment and then to remove ore was essential. Terrain determined access routes—trails and roads were placed in the areas of least resistance. One terrain feature that is relevant to the road in question is known as Hanging Rock, which is located above Sneffels Creek between Camp Bird and Yankee Boy Basin.... The relevance of Hanging Rock is that until it was blasted by Otto Mears in 1889, alternative access to Yankee Boy Basin was used.... An alternative access before 1889 was through the area contested in this case.

> The trail system described above remained in use for mining purposes from the 1870's to about 1910—between 30 and 40 years. During 1877, a survey was done showing the Quinn and Richardson claim from the Seven Thirty Lode and Richardson's Cabin.... In 1879, Andrew W. Richardson made application for a Post Office at the Richardson cabin above Camp Bird on Sneffels Creek in the direction of Yankee Boy Basin.... The significance of the Camp Bird post office application is the

map [which] shows the Town of Ouray, the Uncompahgre River, Canon (also spelled Canyon) Creek, a wagon road along Canon Creek, and a road branching south from the wagon road that crosses Sneffels Creek and then parallels Imogene Creek to Upper Camp Bird where the Camp Bird post office was located. [The map shows] the road crossing Sneffels Creek and going to the Camp Bird post office existed in 1898, and combined with [another map in the same exhibit] that road existed either as a road or as a trail parallel to Imogene Creek in 1877.

*I find that the wagon road [shown in the post office application] is CR 361, and at the road fork at the confluence of Sneffels Creek and Imogene Creek, CR 361 goes south across Sneffels Creek, curves to the northwest then curves to the southeast, and thereafter generally parallels Imogene Creek as it ascends toward Imogene Pass.... It is the road branching south from the wagon road that crosses Sneffels Creek that is in dispute in this case.*

(Emphasis added; footnotes, references to, and discussions of exhibits omitted; citations to testimony omitted; formatting added.)

 Therefore, based on the trial court's findings, which are well supported and essentially undisputed in the record, we conclude that public use of the road segment commencing in the 1870s was sufficient under our supreme court's jurisprudence to accept the grant made by the United States in R.S. 2477.

## IV. Glen Monarch Lode

The road segment traverses the Glen Monarch Lode just south of the bridge.

The trial court concluded, and the mining company agrees, that the Glen Monarch Lode was removed from the public domain on June 19, 1876. The trial court further concluded, and the mining company disagrees, that the public adversely possessed the road segment on the Glen Monarch Lode subsequent to 1876. Accordingly, the trial court concluded the road segment is a public road.

 We conclude the Glen Monarch Lode was not removed from the public domain until, at the earliest, October 2, 1880, when the certificate of location was recorded. Having reached this conclusion, we also conclude the portion of the road segment on the Glen Monarch Lode was in the public domain at the time of the county declaration and public use. Therefore, the road segment on the Glen Monarch Lode is a public road by acceptance of the R.S. 2477 grant, and we need not address the trial court's adverse possession analysis.

It is undisputed that one H.F. Blythe recorded a Location Certificate for the Glen Monarch Lode on October 2, 1880. That certificate recites that the claim was "located" on June 29, 1876. The state statute in effect at the time with respect to locating mineral claims stated:

Sec. 3. The discoverer of a lode shall within three (3) months from the date of discovery, record his claim in the office of the Recorder of the county in which such lode is situated, by a location certificate which shall contain: 1st. The name of the lode. 2d. The name of the locator. 3d. The date of the location. 4th. The number of feet in length claimed on each side of the center of discovery shaft. 5th. The general course of the lode as near as may be.

Sec. 5. Before filing such location certificate, the discoverer shall locate his claim by first sinking a discovery shaft upon the lode to the depth of at least ten (10) feet from the lowest part of the rim of such shaft at the surface, or deeper, if necessary to show a well defined crevice. Second—by posting at the point of discovery on the surface, a plain sign or notice containing the name of the lode, the name of the locator, and the date of discovery. Third—By marking the surface boundaries of the claim.

Territorial Laws of Colorado 186–87 (1874) (moved to General Laws of Colorado 629 (1877) and now codified without substantive amendment at §§ 34–43–103, –106, C.R.S. 2008).

The earliest case construing the statute is *Faxon v. Barnard,* 4 F. 702 (C.C.D.Colo.

1880). In that case, there was a dispute between two prospectors whose claims overlapped. Based on the pleadings, the court found that the plaintiff commenced his location in February 1878, completed it in July 1878, but apparently did not file a certificate of location. The defendant commenced his location in February 1878 and recorded his certificate of location March 1878, "at which time plaintiff had not secured any right to the ground in controversy, as [he] had not then done all that was required to complete [his] location." *Id.* at 704. Therefore, all that being true, according to the court, the defendant would prevail. However, the certificate of location filed by the defendant was void for want of an adequate description. Thus, according to the court, the matter would be determined by actual possession. The court posited the issue and stated the resolution as follows:

A question common to both claims is whether a certificate of location must be filed of record in the office of the recorder of the county in which the claim may be, within three months next after the discovery of the lode, as required by the act of assembly of 1874. Rev. St. 629. In terms, the act requires the certificate to be filed within that time; and, to secure the claim from the date of discovery against intervening claimants seeking to locate the same ground, it would seem to be necessary to comply with its provisions. But no reason is perceived for saying that the certificate shall be invalid if not filed within the time fixed by law. The design of the law clearly is to give the discoverer time for doing the acts necessary to a proper location. He may sink his discovery shaft within 60 days; he may put up his discovery notice, and his boundary stakes, and record his certificate of location within three months; failing in this he shall have no right as against one who has been more diligent in fulfilling the statute, although later in point of time. But when all things have been done as the act requires, before any other and better right to the same ground has been perfected, it seems to be just and entirely consistent with the statute to recognize the location as having been properly made.

. . . .

[T]he question is whether defendants to their grantors were in actual possession at the time plaintiff's location was made. That they were on the ground before that time is shown by testimony which is not contradicted, and the burden is upon the plaintiff to show that they were not there at the time of his location; for if they were then in actual possession, having uncovered the lode, plaintiff's grantor, claiming by subsequent discovery, could not oust them so long as they saw fit to remain there. As to the ground actually held by them, although if they failed to locate under the law they could not claim more, no one by junior discovery could assert a superior title.

*Id.* at 703, 705.

*Strepy v. Stark,* 7 Colo. 614, 5 P. 111 (1884), also involved a dispute between two prospectors. The first prospector arrived in June 1879, discovered a locatable mineral, sunk a shaft to ten feet, posted a complying sign, and did the remaining on-site activities required. He then filed his certificate in September of that year. The second prospector arrived in the spring of 1880, saw remnants of a sign and a shallow hole, dug the hole to ten feet, removed mineral, and filed a certificate of location in August of that year. Both original certificates of location were void for want of an adequate description. The first prospector filed an amended certificate in June 1881, and the second prospector filed an amended certificate in September 1881. The matter turned on the amended certificates of each prospector. Because the first prospector's amended certificate was filed first in time, the first prospector prevailed. In discussing the purpose of the certificate of location, the court stated:

The question here raised is one of importance in this class of cases, and one that, so far as we can ascertain, has not before been passed upon by any court of last resort; so that we are left to determine it without the aid of adjudged precedent. . . .
The question rests chiefly if not wholly upon what we are to consider as the nature, purpose, and functions of such location certificate. Its objects and functions

are peculiar; it differs from ordinary documentary muniments of title in that it is not a title nor proof of title; nor does it constitute or of itself establish the possessory right in issue, and to which it relates. It is purely a creature of the statute, and, under the evident legislative intent, its purposes and functions are twofold: When duly recorded, it becomes notice to the world of the facts therein set forth ... and is thus constructive notice of the claimants' possession. *In addition to this purpose, which it is to serve, it would seem that by statute such certificate is made one of the steps requisite to constitute a perfected mining location.*

Under the law, four certain things are to be done in order to perfect a location: *First,* the sinking of a discovery shaft upon the lode 10 feet in depth, or deeper if necessary, to disclose mineral in place; *second,* the posting of a notice at the place of discovery, giving the name of the lode, the name of the locator, and the date of discovery; *third,* marking the surface boundaries of the claim by posts, in the manner pointed out by statute; and, *fourth, making and recording a location certificate containing the name and description of the lode, the name of the locator, and the date of the location.*

*Id.* at 617–18, 5 P. at 113–14 (emphasis added).

The *American Law of Mining* states: "In states in which recording is an essential act of location, if the locator fails to record, he can hold his claim only by actual possession." 2 *American Law of Mining* § 33.09[7], at 33–89 (citing *Faxon v. Barnard,* 4 F. 702; *Armstrong v. Lower,* 6 Colo. 581 (1883); *Couch v. Clifton,* 626 P.2d 731 (Colo.App. 1981) (a miner may possess his claim either by continual occupancy of the land or by filing location certificate with county recorder)).[3]

Based on these authorities, we conclude, contrary to the trial court's determination, that the location of the Glen Monarch Lode was not complete so as to remove it from the public domain and therefore beyond the reach of R.S. 2477 until, at the earliest, the recording of the certificate of location on October 2, 1880. Accordingly, the road segment on the Glen Monarch Lode is a public road by virtue of the county's declaration and the public use accepting the R.S. 2477 grant.

In light of our analysis, we need not address whether the public obtained a right-of-way over the Glen Monarch Lode by adverse possession.

## V. Discovery

Last, the mining company contends the trial court erred by allowing the county to present testimony and exhibits in violation of our rules of civil procedure. Specifically, the mining company argues (1) the trial court should have prevented the county's history expert from testifying based on expert disclosure abuses, more specifically, in not providing the mining company with the full expert report until eleven days before trial; (2) the county failed to designate an additional witness in response to the mining company's C.R.C.P. 30(b)(6) deposition notice; and (3) the trial court erred in allowing witnesses and twelve exhibits that first were identified only twenty-five days before trial. We disagree.

■ We review evidentiary rulings for abuse of discretion. *People v. Stewart,* 55 P.3d 107, 122 (Colo.2002); *People v. Huckleberry,* 768 P.2d 1235, 1242 (Colo.1989).

### A. Preserved Issues

■ The county first contends the mining company failed to preserve the issues for appeal regarding the county's expert report and the witnesses designated twenty-five days before trial because it failed to make contemporaneous objections. However, the mining company filed pretrial motions on these issues, and the trial court made definitive rulings on the record prior to trial. Once the trial court makes definitive rulings either at or before trial, the objecting party need not renew the objection contemporaneously during trial to preserve a claim of error

---

**3.** Inexplicably, the treatise suggests elsewhere that Colorado does not require a location certificate in order to perfect a location. *See* 2 *American Law of Mining* § 33.09[1][a], at 33–74, –75.

on appeal. *See* CRE 103(a)(2). Thus, the issues were preserved.

### B. The County's Expert

The mining company alleges the trial court erred by allowing testimony from the county's expert even though his expert report was submitted eleven days before trial. We are not persuaded.

■■ Among the many important purposes of discovery, the most central to a fair trial is the parties' production of all relevant evidence. *Trattler v. Citron*, 182 P.3d 674, 679 (Colo.2008). Under C.R.C.P. 26(a)(2)(B)(I), a party must disclose (1) the identity of each expert witness; (2) the expert's qualifications; (3) a summary or report of the expert's findings as to the case; (4) any exhibits to be used; (5) a list of the expert's past publications; (6) the compensation the expert will receive for his or her work; and (7) a list of previous cases in which the expert testified. Under C.R.C.P. 37(c)(1), failure to disclose evidence without substantial justification requires preclusion of that evidence at trial, unless the failure is harmless. However, the court may, on motion and after affording an opportunity to be heard, impose other appropriate sanctions. C.R.C.P. 37(c)(1).

■■ Thus, when a party violates discovery rules, the trial court may chose appropriate sanctions, which may include evidence preclusion; however, such a sanction is not mandatory if it is not appropriate. *Trattler*, 182 P.3d at 681. A trial court has considerable discretion in determining whether and what sanctions should be imposed for discovery violations; this discretion enables the trial court to choose between two or more courses of action and does not bind it to select one course over an alternative. *Municipal Subdist. v. OXY USA, Inc.*, 990 P.2d 701, 710 (Colo.1999). While this discretion may include precluding a witness from testifying altogether, a lesser sanction such as excluding untimely-disclosed evidence may be equally appropriate. *Trattler*, 182 P.3d at 682. In *Trattler*, the plaintiff failed to provide the defendants with her experts' complete testimonial history; our supreme court determined that the omission was not egre-

gious enough to merit exclusion of the experts' entire testimony and held that the trial court's decision to do so was error. *Id.* at 680–82.

Here, the county's expert was timely disclosed, including the required summary report of his findings. The mining company argues that receiving his fully-detailed report eleven days before trial prejudiced it. However, the trial court exercised its discretion and specifically redacted portions of the county's expert's report that previously had not been made known to the mining company. The mining company knew the substance of the expert's testimony—to wit, that the road was public and why—and received all the other disclosures required by C.R.C.P. 26. The mining company also deposed the expert as to his conclusions before trial.

■■ We conclude the trial court was not required to preclude the expert witness's testimony in its entirety and did not abuse its discretion in allowing the expert to testify after redacting parts of his report to prevent surprise and unfairness.

### C. Failure to Designate Witnesses

The mining company also contends the county failed to designate witnesses in response to its C.R.C.P. 30(b)(6) notice.

Under C.R.C.P. 30(b)(6)

[a] party may in his notice name as the deponent a . . . governmental agency and designate with reasonable particularity the matters on which examination is requested. The organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and *may* set forth, for each person designated, the matters on which he will testify. The persons so designated shall testify as to matters known or reasonably available to the organization.

(Emphasis added.)

■■ The burden under C.R.C.P. 30(b)(6) is to produce witnesses who are knowledgeable, not to produce an exhaustive list of witnesses to testify as to each and every factual assertion made by the organization.

*See D.R. Horton, Inc.-Denver v. D & S Landscaping, LLC*, 215 P.3d 1167, 1167, 2008 WL 2522232, *4 (Colo.App. No. 07CA0890, June 26, 2008) (the organization must make a good faith effort to designate knowledgeable persons to testify on its behalf and prepare the designated deponents to answer fully and unevasively); *see also Sprint Commc'ns Co. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D.Kan.2006) (the comparable federal rule makes clear that a party is not permitted to undermine the beneficial purposes of the rule by responding that no witness is available with personal direct knowledge); *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D.Fla.1995) (the federal rule delineates an affirmative duty to produce a representative who can answer questions both within the scope of the matters described in the notice and as to information known or reasonably available to the corporation), *aff'd*, 213 F.3d 646 (11th Cir.2000) (unpublished table decision).

Under C.R.C.P. 30(b)(6), persons designated must be knowledgeable as to the matters at issue and as to facts pertinent to the organization regarding the issue, and they must testify as to the specifically requested information. By contrast, persons not designated can testify and are not required to include in their testimony matters known or reasonably available to the organization. In other words, not being listed under C.R.C.P. 30(b)(6) does not *disqualify* a person from testifying, but rather being listed under C.R.C.P. 30(b)(6) mandates that the witness's testimony include certain subject matter and knowledge.

■ In addition, nothing in C.R.C.P. 30(b)(6) precludes an organization from offering either contrary or clarifying evidence where a designated deponent has no knowledge of a particular matter, *see D.R. Horton*, 215 P.3d at 1168, 2008 WL 2522232, *5, and we have found no authority precluding such evidence. In short, simply because a witness is not a designated C.R.C.P. 30(b)(6) witness on behalf of an organization does not preclude that witness from testifying as to matters regarding or on behalf of that organization. *Id.* at 1168, 2008 WL 2522232, *5. Quite the opposite, the organization is al-

lowed to call non-designated persons as fact witnesses. *Id.; see also D.C. Concrete Mgmt., Inc. v. Mid–Century Ins. Co.*, 39 P.3d 1205, 1209 (Colo.App.2001) (organization allowed to present testimony that contradicted the testimony of its designated C.R.C.P. 30(b)(6) deponent where opposing party knew of, had the opportunity to, and did depose the organization's witnesses who were not designated under C.R.C.P. 30(b)(6), and consequently suffered no unfair prejudice and was not unduly surprised by their testimony at trial).

Here, the county produced witnesses under C.R.C.P. 30(b)(6) who were knowledgeable both as to the facts regarding the county and as to those at issue at trial. The mining company was aware of the additional witnesses before trial, and it had the opportunity to, and did, depose them. Accordingly, we conclude the trial court did not abuse its discretion in allowing such testimony at trial.

**D. New Witnesses and Exhibits Disclosed Twenty–Five Days Before Trial**

■ Last, the mining company contends the county first disclosed new witnesses and exhibits to it twenty-five days before trial, and this late disclosure prejudiced it. We disagree.

Under C.R.C.P. 26(a)(1) and as relevant here, "a party shall, without awaiting a discovery request, provide to other parties" (1) the name and information of each individual with discoverable information and (2) all documents not privileged or protected that are relevant to disputed facts. These disclosures "shall be [made] within 30 days after the case is at issue," as defined in C.R.C.P. 16. C.R.C.P. 26(a)(1). Under C.R.C.P. 37(a)(2) and (c), if a party fails to make the required C.R.C.P. 26(a) disclosures, the opposing party may move to compel and request appropriate sanctions; when a party fails, without substantial justification, to make such C.R.C.P. 26(a) disclosures, unless such failure is harmless, that party shall not be permitted to present any undisclosed evidence.

■ The purposes of pretrial discovery include the elimination of surprise at trial, the discovery of relevant evidence, the

simplification of issues, and the promotion of expeditious settlement of cases. *Hawkins v. Dist. Court*, 638 P.2d 1372, 1375 (Colo.1982). In addition, a party is under a continuing duty to supplement disclosures under C.R.C.P. 26(a) when it learns that in some material respect the information is incomplete or incorrect. C.R.C.P. 26(e).

The mining company cites *Todd v. Bear Valley Village Apartments*, 980 P.2d 973, 979 (Colo.1999), for the proposition that when disclosure of a trial witness occurs close to the trial, it is likely that the late disclosure will cause prejudice. However, *Todd* reaffirmed the notions that "sanctions should be commensurate with the seriousness of the disobedient party's conduct" and that "witness preclusion is a *severe sanction and should only be invoked when there has been serious misconduct," id.* (emphasis added) (quoting in part *J.P. v. Dist. Court*, 873 P.2d 745, 751 (Colo.1994)), but did not hold that late disclosures automatically cause prejudice.

 A party should not be denied its day in court by an inflexible application of a procedural rule that would sanction a nondisclosing party by precluding a witness. *Id.* Further, *Todd* held that serious misconduct is one of several factors to consider under C.R.C.P. 37(c) when imposing sanctions. *Id.* The controlling question is not whether the new evidence is potentially harmful to the opposing party's case, but rather whether the party's failure to timely disclose the evidence will *prejudice* the opposing party by denying that party an adequate opportunity to defend against the evidence. *Id.* Thus, the question is not to what degree a trial court relied on the untimely disclosed evidence in making its decision, as the mining company urges, but rather whether the opposing party had an opportunity to defend against the evidence.

After reviewing the record, we conclude the mining company had an adequate opportunity to defend against the complained-of witnesses and exhibits. Most exhibits were demonstrative only, and many of the complained-of witnesses had previously been disclosed to the mining company. Further, the witness the mining company specifically contends prejudiced it is cited in the trial court's order only twice, first for the purpose of discussing an exhibit and second for listing ways the county used the road. We do not believe this late disclosure rose to the level of trial by ambush or surprise, and it certainly does not exemplify serious misconduct that prevented an adequate opportunity to defend against the evidence.

The judgment is affirmed.

Judge TAUBMAN and Judge GABRIEL concur.

Appendix A