2015 COA 116

**MCGILLIS INVESTMENT COMPANY, LLP, Plaintiff–Appellee,**

v.

**FIRST INTERSTATE FINANCIAL UTAH LLC, a Utah limited liability company; First Interstate Financial LLC, a Nevada limited liability company; and Paul Thurston, as a manager of First Interstate Financial Utah LLC, as a manager of First Interstate Financial LLC, and as an individual, Defendants–Appellants.**

Court of Appeals No. 14CA1568

Colorado Court of Appeals,
Div. IV.

Announced August 13, 2015

Weld County District Court No. 11CV542, Honorable Julie C. Hoskins, Judge

Allen & Vellone, P.C., Patrick D. Vellone, Jordan Factor, Denver, Colorado, for Plaintiff–Appellee.

Hall & Evans, L.L.C., Andrew D. Ringel, Denver, Colorado, for Defendants–Appellants.

Opinion by JUDGE GRAHAM

¶ 1 Defendants, First Interstate Financial Utah LLC, First Interstate Financial LLP, and Paul Thurston (collectively, FIF), appeal the judgment entered on a jury verdict awarding plaintiff, McGillis Investment Company, LLP (MIC), $1,300,625 and fee simple ownership of sixty-three acres of property located in Kersey, Colorado. We affirm.

## I. Background

¶ 2 This appeal follows a long and complicated history, including prior litigation in Utah, an earlier appeal to this court, an eight-day trial, and a series of motions brought before, during, and after the trial and the verdict. A voluminous record, spanning thousands of pages, contains an exhaustive rendition of the facts. Other than to generally summarize the dispute, we will present only those facts necessary to place the background in context. Other facts will be developed as we analyze the particular issues on appeal.

¶ 3 MIC's principal, Richard McGillis, and FIF's principal, Thurston, worked together to finance a multitude of commercial real estate loans between 1995 and 2009. Thurston, who had expertise in the banking industry, would investigate possible loans and make recommendations to MIC. If acceptable, MIC would loan money to the recommended borrower, with MIC receiving interest on the transaction and FIF receiving an origination fee on the loan.

¶ 4 The current dispute surrounds a 2003 loan made by MIC and FIF to Kersey Commercial Park, LLC (Kersey Commercial) for $1,850,000 (the Kersey Loan or the Loan) to purchase approximately sixty-three acres of property in Kersey, Colorado, to develop an industrial park (the Kersey Property or the Property). In September 2003, Larry Carnahan, Thurston's friend and a mortgage broker with New Frontier Bank, contacted FIF about providing financing for the purchase of the Kersey Property. Kersey Commercial, owned equally by Ron Erbes and Fred Allison, who was another mortgage broker at New Frontier Bank, proposed to purchase the Property from Sytech Development for $3,000,000. Carnahan prepared a prospectus that showed over $1,200,000 in commercial presale contracts on the Property and collateral securing the Loan that included "an income-producing commercial real

estate property in Laramie, Wyoming valued in excess of $1,000,000." Thurston recommended that MIC finance the Loan.

¶ 5 What MIC did not know was that Carnahan, Allison, and Jonathan and Matthew Sysum (the Sysum brothers), who owned Sytech Development, were involved in a series of transactions of questionable legitimacy surrounding the Kersey Property. For example, Carnahan, who recommended financing the $3,000,000 purchase of the Property, had in fact purchased the Property himself only two years prior for $502,000, at Allison's prompting. Thereafter, for approximately $40,000 (the amount of interest that Carnahan had paid on the notes against the Property while he owned it), Carnahan quitclaimed his interest in the Property to Sytech Development. At the time MIC funded the Kersey Loan, the Property was still encumbered by Carnahan's outstanding $500,000 in loans.

¶ 6 Ron Erbes, co-owner of Kersey Commercial, quitclaimed his home to Jonathan Sysum as collateral for the purchase of the Kersey Property. At that time, the home was encumbered by mortgages of approximately $1,000,000, which Erbes disclosed to Jonathan Sysum when he pledged the collateral. The exact amount Kersey Commercial actually paid at closing cannot be firmly documented.

¶ 7 Kersey Commercial never made a payment on the Loan and was in default by May 2004. Nevertheless, Thurston—on behalf of MIC and FIF—executed a Dry–Up Agreement on July 29, 2004, which sold "one (1) share of the capital stock of the Lower Latham Ditch Company, and one-half (1/2) of a share of the capital stock of the Lower Latham Reservoir Company (hereinafter "Water Rights")" of the Kersey Property to Lower Latham Reservoir Company. In exchange for these water rights, Lower Latham Reservoir Company paid Sytech Development $785,000. Erbes testified that this was done so that Jonathan Sysum would quitclaim Erbes' home back to him.

¶ 8 In October 2004, Thurston held several meetings with Erbes, Allison, Carnahan, Jonathan Sysum, and others involved in the development of the Kersey Property. The

meeting minutes reflect that Thurston attempted to work out a solution to get the Kersey Loan current. However, because Kersey Commercial had no current or prospective income, MIC and FIF foreclosed on the Property.

¶ 9 On May 12, 2005, MIC and FIF purchased the Kersey Property at foreclosure for $1,600,000. Thurston, apparently in an attempt to repair his relationship with MIC, offered to sue the appraisers of the Kersey Property and give MIC any proceeds of that litigation after subtracting his legal costs.

¶ 10 On June 6, 2006, FIF sued the appraisers. Thereafter, on November 8, 2006, Thurston approached MIC and asked that MIC execute an assignment of the Property (the Assignment), which it did. The Assignment reads in full:

> For good and valuable consideration, McGillis Investments (Assignor) hereby assigns all its rights, title and interest to the property in Kersey, Colorado (Reference "Exhibit A" attached) to First Interstate Financial (Assignee) as of this 8th day of November, 2006.
>
> By granting this assignment, McGillis Investments is foregoing any further claim or interest in said property.

¶ 11 The purpose of the Assignment is in dispute; FIF argues it was to give FIF all interest in the Kersey Property, while MIC argues it was solely to make it possible for FIF to pursue the appraiser litigation. In any event, the evidence adduced at trial showed that until June 2010, both FIF and MIC considered themselves joint owners of the Property, notwithstanding the Assignment. FIF settled the appraiser litigation for $438,500 and remitted the proceeds to MIC.

¶ 12 In February 2009, FIF filed suit against Sytech Development over the Kersey Loan (the Sytech litigation). Whether MIC was aware of this suit is disputed.

¶ 13 After Richard McGillis's son took over MIC in 2008, he examined the relationship between MIC and FIF and concluded that FIF had breached its fiduciary duty to MIC in a variety of transactions. On April 2,

2009, MIC filed suit in Utah against FIF alleging (1) breach of fiduciary duty; (2) fraud; (3) negligent misrepresentation; (4) exploitation of a vulnerable adult; (5) unjust enrichment; (6) injunctive relief; and (7) breach of contract. During the Utah litigation, FIF responded to written discovery and produced documents relating to the Kersey Loan. In October 2010, the jury in the Utah case returned a verdict in MIC's favor for $1,250,000 in unspecified damages.

¶ 14 On October 25, 2010, three days after the Utah jury returned its verdict, FIF recorded the Assignment with the Weld County Clerk and Recorder. FIF then settled the Sytech litigation on November 17, 2010, for $20,000.

¶ 15 On June 1, 2011, MIC filed the current lawsuit against FIF in Weld County. In its complaint, MIC sought (1) quiet title to the Kersey Property and (2) damages for breach of fiduciary duty for FIF's recording the Assignment and settling the Sytech litigation. At trial, MIC further argued it was entitled to damages for breach of fiduciary duty for FIF's execution of the Dry–Up Agreement. MIC also sought damages for unjust enrichment, breach of oral agreement, and constructive trust.

¶ 16 Both parties filed motions for summary judgment. In part, FIF argued that claim preclusion barred MIC from litigating the validity of the Assignment because it should have raised that claim in the Utah lawsuit. The trial court agreed and granted summary judgment in favor of FIF on that issue. As a result, the court also entered judgment in favor of FIF and a decree quieting title to the Kersey Property in FIF.

¶ 17 MIC appealed. A division of this court, in *McGillis Investment Company, L.L.P. v. First Interstate Financial Utah, LLC,* (Colo. App. No. 12CA1634, 2013 WL 2364643, May 30, 2013) (not published pursuant to C.A.R. 35(f)) (*MIC I*), affirmed the judgment in part and reversed it in part and vacated the decree quieting title in FIF. On the issue of claim preclusion, the division concluded that there was "a genuine issue of material fact as to whether MIC knew or should have known that there was a dispute concerning the Assignment's validity or the ownership of the Property when it filed its Utah action," and, therefore, reversed the summary judgment and remanded the case for further proceedings. *Id.* at slip op. at 11–12.

¶ 18 On remand, the case proceeded to trial. FIF filed two motions in limine seeking to exclude the Sysum brothers' testimony because, during discovery, they had invoked their Fifth Amendment privilege against self-incrimination. Ultimately, the trial court allowed MIC to call both Sysum brothers, who again both invoked their Fifth Amendment privilege, and gave the jury an adverse inference instruction regarding only Jonathan Sysum's invocation.

¶ 19 The jury returned a verdict in favor of MIC for $1,300,625. It concluded in a set of special interrogatories that the Assignment was not intended to transfer ownership of the Property and that MIC owned one hundred percent of the Property. Thereafter, the trial court entered judgment in favor of MIC and a decree quieting title of the Property in MIC.

¶ 20 In the current appeal, FIF makes two primary contentions: (1) that the trial court did not follow the mandate from this court on remand by failing to determine whether MIC knew or should have known of the Assignment's validity when it filed the Utah action; and (2) that the court erred in allowing the Sysum brothers to invoke their Fifth Amendment privilege against self-incrimination in front of the jury and in giving an adverse inference instruction related to Jonathan Sysum.

¶ 21 At the outset, we note that because FIF filed motions in limine seeking to exclude the Sysum brothers' testimony and made contemporaneous objections at trial, FIF properly preserved the Fifth Amendment issue before the trial court. It also preserved the claim preclusion issue by requesting at trial that the court "enter an order deeming claim preclusion to bar MIC's claim of ownership regarding the Property."

II. When Should a Nonparty Witness in a Civil Case Be Allowed to Invoke the Fifth Amendment Privilege Against Self–Incrimination in Front of the Jury?

¶ 22 We begin with what we view as the principal issue in this appeal, namely, the

admissibility of the Sysum brothers' invocation of their Fifth Amendment privilege against self-incrimination and the court's decision to give an adverse inference instruction regarding Jonathan Sysum's invocation. FIF argues that no authority permits a party in a civil action to benefit from an adverse inference drawn from the exercise by a nonparty witness of the privilege against self-incrimination, unless the witness is an agent or under the control of the party against whom the inference is sought. For the reasons discussed below, we disagree.

## A. Standard of Review

¶ 23 Generally, "[w]e review a trial court's evidentiary rulings for an abuse of discretion." *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 2012 CO 30M, ¶ 12, 280 P.3d 649. However, whether the trial court applied the correct legal standard to admit evidence is a question of law we review de novo. *Id.* Accordingly, the question of whether a nonparty witness's invocation of the Fifth Amendment privilege constitutes admissible evidence is a question of law which we review de novo. *FDIC v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995); *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 274 (3d Cir. 1986).

¶ 24 To the extent that the trial court must balance issues of prejudice and probative value under CRE 403, which FIF also argued at trial, we review only for an abuse of discretion. *See Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 45, 327 P.3d 255 ("The trial court's decision under Rule 403 will not be disturbed on review absent an abuse of discretion, defined as a decision that is manifestly arbitrary, unreasonable, or unfair.").

## B. Law

¶ 25 Generally, "[a]ll relevant evidence is admissible." CRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Nevertheless, "[a]lthough relevant, evidence may be excluded if its probative value is substantially out-weighed by the danger of unfair prejudice." CRE 403.

¶ 26 As pertinent here, the Fifth Amendment to the United States Constitution provides that "[n]o person shall be compelled, in any criminal case, to be a witness against himself." U.S. Const. amend. V. The privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). However, "[t]he Fifth Amendment privilege against compelled self-incrimination operates differently in criminal and civil contexts." *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014); *see Steiner v. Minn. Life Ins. Co.*, 85 P.3d 135, 139–40 (Colo. 2004).

¶ 27 In civil cases, an adverse inference may be drawn against *a party* who invokes the Fifth Amendment privilege against self-incrimination. *See Asplin v. Mueller*, 687 P.2d 1329, 1332 (Colo. App. 1984) ("[A] party to a civil proceeding may be called for testimony even if he will be claiming the privilege. If he declines to answer certain questions on Fifth Amendment grounds, it is not error to require him to invoke the privilege in the presence of the jury; and, in that event, instructions [that the jury can draw an adverse inference] are appropriate." (citation omitted)); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them...."); Robert Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1110–12 (1982).

¶ 28 No Colorado case has addressed whether a *nonparty* witness's invocation of the Fifth Amendment privilege constitutes admissible evidence. However, several state and federal cases have considered the matter:

> The prevailing authority today is that the admissibility of a non-party's invocation of its Fifth Amendment privilege against self-

incrimination should be analyzed using the balanc[ing] test in Fed. R. Evid. 403 and its state counterparts, *Brink's, Inc. v. City of New York,* 717 F.2d 700, 710 (2d Cir. 1983), and that questions regarding admissibility should be decided on a case-by-case basis. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.,* 819 F.2d 1471, 1481 (8th Cir. 1987); *Brink's, Inc. v. City of New York,* 717 F.2d at 708.

*Levine v. March,* 266 S.W.3d 426, 443 (Tenn. Ct. App. 2007); *see Coquina Invs.,* 760 F.3d at 1310 ("[T]he admissibility of a nonparty's invocation of the Fifth Amendment privilege against self-incrimination and the concomitant drawing of adverse inferences should be considered 'on a case-by-case basis.'" (quoting *Cerro Gordo,* 819 F.2d at 1481)); *LiButti v. United States,* 107 F.3d 110, 123 (2d Cir. 1997); *RAD Servs.,* 808 F.2d at 277; *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 522 (8th Cir. 1984); *see also Rhode v. Milla,* 287 Conn. 731, 949 A.2d 1227, 1233 (2008) ("[I]t is settled law in other jurisdictions that a nonparty's invocation of the fifth amendment privilege against self-incrimination is admissible evidence so long as it does not unduly prejudice a party to the case."); *Lentz v. Metro. Prop. & Cas. Ins. Co.,* 437 Mass. 23, 768 N.E.2d 538, 542 (2002) (discussing state and federal cases); *Andrew Carothers, M.D., P.C. v. Ins. Cos. Represented by Bruno, Gerbino & Soriano, LLP,* 26 Misc.3d 448, 888 N.Y.S.2d 372, 383–84 (N.Y. Civ. Ct. 2009) (same); *but see Fortin v. York Mut. Ins. Co.,* No. CV–91–517, 1997 WL 35018699, at *3 (Me. Super. Ct. 1997) (Under Maine Rule of Evidence 513(b), "[a] nonparty's witness's invocation of the Fifth Amendment in a civil case in Maine does not go before the jury.").

¶ 29 The United States Court of Appeals for the Second Circuit has identified four "non-exclusive factors" to be used when considering whether to admit testimony from a nonparty invoking his or her Fifth Amendment privilege and whether to permit a fact finder to consider an adverse inference against a party arising from such testimony. *LiButti,* 107 F.3d at 123.

Although the issue of the admissibility of a non-party's invocation of the Fifth Amendment privilege against self-incrimination in the course of civil litigation and the concomitant drawing of adverse inferences appropriately center on the circumstances of the case, the evolving case law and its underlying rationale accordingly suggest a number of non-exclusive factors which should guide the trial court in making these determinations.

*Id.*

¶ 30 The first of these factors is the nature of the relevant relationships between the parties and the witness, focusing on the perspective of the nonparty witness's loyalty to the plaintiff or the defendant. *Id.*

¶ 31 Second, "[t]he degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation" will suggest whether the testimony might serve as a vicarious admission. *Id.*

¶ 32 Third, a court should examine the compatibility of interests of the affected party and the nonparty witness to determine "whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Id.*

¶ 33 Fourth, the nonparty witness's role in the litigation should be examined to determine whether the nonparty witness was a key figure in the litigation and played a controlling role in any of the underlying aspects of the litigation. *Id.* at 123–24.

¶ 34 The *LiButti* analysis was applied in a case bearing some similarity to the case at hand. In *Lentz,* 768 N.E.2d at 544, the Supreme Judicial Court of Massachusetts held that the invocation of the privilege by a nonparty insurance adjuster and body shop employee was relevant to the insurer's fraud defense and was admissible. The court recognized that some courts allow adverse inferences to be drawn against a party even though the invoking witness has no employment or agency relationship with the party. *Id.* at 542. Relying on the *LiButti* test, the

court concluded that an adverse inference could be drawn where a joint venture relationship and long-term friendship were established between a party and the nonparty witness. *Id.* at 542–43. "Ultimately, the test is whether any adverse inference sought is reasonable, reliable, relevant to the dispute, and *fairly* advanced against a party." *Id.* at 543.

¶ 35 We agree with and adopt the *LiButti* analysis—the admissibility of a nonparty's invocation of the Fifth Amendment privilege and the concomitant drawing of adverse inferences should be considered by courts on a case-by-case basis to assure that any inference is reliable, relevant, and fairly advanced. We are informed in our analysis by the nonexclusive factors set forth by the Second Circuit in *LiButti*. Ultimately, the overarching concern should be "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti*, 107 F.3d at 124.

¶ 36 And when evidence of a nonparty witness's invocation is properly admitted, "the jury need only be instructed that they are permitted, but not required, to draw an inference adverse to a party from a witness's invocation of the privilege against self-incrimination, and that they should not draw such an inference if they find that the witness invoked the privilege for reasons unrelated to the case on trial." *Lentz*, 768 N.E.2d at 545.

¶ 37 Reviewing de novo, we now turn to the particular circumstances of this case.

## C. Analysis

¶ 38 Prior to trial, FIF filed two motions in limine seeking to exclude the Sysum brothers' testimony invoking their Fifth Amendment privilege. The trial court ruled in both instances that the testimony "goes directly to the relationship between ... [FIF] and the Sysums, and the resolution of the Sytech litigation." However, the court declined to decide whether the Sysum brothers would be allowed to invoke their Fifth Amendment privilege in front of the jury, determining instead that the court was "without sufficient

information to make a ruling" and that the issue would be better addressed at trial.

¶ 39 On the second day of trial, MIC sought to call the Sysum brothers. The court determined that based on the fact that MIC had not independently shown that Thurston had a special relationship or "special tie" with either Jonathan or Matthew Sysum, it could not "find that there are any factors here, at least at this time, which would weigh in favor of having the Sysums exercise their Fifth Amendment right in front of the jury." However, the court left open the option to call the Sysum brothers if MIC could provide independent probative facts of a relationship between them and Thurston. The court then extended the Sysum brothers' subpoenas so they would remain available to testify. Both brothers objected to the extension.

¶ 40 The following morning, MIC proposed that it be allowed to call both Sysum brothers and ask a single innocuous question—"Is Sytech Development, Inc., your company?"—to which both would presumably respond by exercising their Fifth Amendment privilege and then be excused by the court. MIC argued this approach would alleviate FIF's concerns that MIC would use questioning to create improper inferences from the Sysum brothers' privilege, *see, e.g., Coquina Invs.*, 760 F.3d at 1312–13 (it is improper to allow questioning on issues not supported by independent admissible evidence when a witness is invoking his or her Fifth Amendment privilege), and it would allow the Sysum brothers to be released from their subpoenas that day. The court agreed, concluding that "the solution proposed by [MIC] is one that is far less prejudicial to [FIF], and quite frankly, I have a difficult time seeing how it really is prejudicial." That afternoon, both Sysum brothers were called to testify, and they both invoked their Fifth Amendment privilege against self-incrimination.

¶ 41 Later, while jury instructions were being discussed, the question of an adverse inference instruction arose. MIC argued that independent evidence had been introduced through Carnahan's and Erbes' testimony, warranting an adverse inference instruction. FIF argued that no evidence of

conspiracy or "side deals" had been introduced, and Thurston had no special relationship with the Sysum brothers warranting such an instruction. The court concluded:

I have considered both parties' arguments as well as the case law. And regarding Matthew Sysum, I agree with [FIF] and so, as to the invocation of Matthew Sysum's exercise of his Fifth Amendment right, the jury may not draw any inference for or against either ... party to this case as a result of Matthew Sysum's assertion of his Fifth Amendment right. The Court reaches a different conclusion regarding Jonathan. And the Court certainly notes [FIF's] objection.

The court instructed the jury:

Matthew Sysum and Jonath[a]n Sysum each invoked his 5th Amendment Right against self-incrimination. It is the witness'[s] constitutional right to do this. As to Jonath[a]n Sysum, the jury may infer, but is not required to infer, that Jonath[a]n Sysum's answers to [MIC's] questions as to the ultimate disposition of the Kersey Property would have provided evidence of [MIC's] claim for breach of fiduciary duty. The jury is to consider all evidence on the issue, not just Jonath[a]n Sysum's invocation of the 5th Amendment.

As to the invocation of Matthew Sys[ ]um's exercise of his 5th Amendment Right the jury may not draw any inference for or against any party to this case as a result of Matthew Sysum's assertion of his 5th Amendment Right.

### 1. Jonathan Sysum

¶ 42 We conclude that MIC introduced sufficient circumstantial evidence from which a jury could infer a conspiracy between Thurston and Jonathan Sysum, thereby making admissible Jonathan Sysum's invocation of his Fifth Amendment privilege and an adverse inference instruction proper. We therefore discern no error of law in the trial court's conclusion that a generic question could be posed which would invoke the assertion of the privilege.

¶ 43 At trial, MIC argued that FIF breached its fiduciary duties by executing the Dry–Up Agreement, recording the Assignment,

and settling the Sytech litigation. The evidence adduced at trial permitted the jury to draw a reasonable inference that Jonathan Sysum was a key character in the conduct of FIF and Thurston. Indeed, the circumstances surrounding the concessions FIF made on behalf of itself and MIC to Sytech Development, in both the Dry–Up Agreement and the Sytech litigation, were at center stage during the trial.

¶ 44 MIC introduced evidence tending to show that Thurston was responsible for all due diligence relating to the Kersey Loan and that multiple portions of the loan transaction were fraudulent. Then, after the Loan closed, Thurston, on behalf of FIF and without informing MIC, signed the Dry–Up Agreement de-collateralizing the Kersey Loan by $785,000, which directly benefited Jonathan Sysum. Particularly damaging was the testimony of Ron Erbes. Erbes testified:

- "We had no collateral [for the Loan] except for at the end of closing ... they wanted me to quitclaim my house which I knew it wasn't possible because it was already mortgaged to the hilt.... [I]t was fraudulent to do that so they promised us it would just be for paperwork for the loan to show the mortgage company that we had something against the loan."

- During closing, "the quitclaim deed went into Sysum's name, which I can't figure that out because [MIC and FIF are] the one[s] that put the money up. I don't—I didn't—never could understand that except there was a plot—there was a ploy behind that, I think, to get the water which we didn't know anything about."

- "I had called John Sysum and told him that I needed my quitclaim back after I figured it out that he had quitclaimed [my house] into his name and he said he wasn't going to return it. So I had some nasty words with him and I threatened him and [the Dry–Up Agreement] is what I got out of it."

- "I did not know at the time, but I do now [that by virtue of signing the Dry–Up Agreement, Sytech Development took

$785,000 from the buyer of the water rights]. And I can't figure out why that ever happened and the money didn't go back to [MIC]. It should have [gone] back to the guy who loaned the money."

- It was his opinion that Jonathan Sysum and Thurston planned to "take a house of mine that was mortgaged to the hilt, quitclaim it—[and] in order for me to get my house back come up [with] this agreement to [give Sytech the proceeds of the Dry–Up Agreement]."

¶ 45 Additionally, Carnahan—who brokered the deal among MIC/FIF, Kersey Commercial, and Sytech Development—testified that he discussed with Thurston that he had purchased the Kersey Property two years prior for approximately $500,000 and that he had approximately $500,000 of liens on the property. Carnahan purchased the property at the insistence of the Sysum brothers and Fred Allison, the other fifty percent owner of Kersey Commercial at the time of the Loan. Carnahan later quitclaimed his ownership of the Property to Sytech Development for approximately $40,000. Carnahan also testified that at the time of closing, the $500,000 in liens—representing $150,000 he owed to Sytech Development and $350,000 he owed to New Frontier Bank—were paid by the funds Kersey Commercial received from MIC.

¶ 46 Lastly, MIC introduced evidence that FIF, purportedly on behalf of itself and MIC, sued Sytech Development in 2009, prior to MIC suing FIF in Utah. Approximately one month after the Utah jury returned a verdict in favor of MIC, FIF settled the Sytech litigation for $20,000, far less than the $1,800,000 originally requested, and refused to produce the settlement agreement or provide an accounting to MIC.

¶ 47 In sum, based on the record before us, a jury could reasonably infer that Thurston collaborated with Jonathan Sysum to perfect a scheme to devalue the Kersey Property and to settle the Sytech litigation for far less

than its reasonable value. Applying the *LiButti* factors, we conclude the trial court did not err in allowing MIC to call Jonathan Sysum to the stand for the purpose of having him invoke the Fifth Amendment privilege in the jury's presence.

¶ 48 Three of the four *LiButti* factors favor the trustworthiness of the adverse inference drawn against FIF. First, viewing the relationship between Thurston and Jonathan Sysum "from the perspective of [the] nonparty witness'[s] loyalty to the ... defendant," *LiButti*, 107 F.3d at 123, Jonathan Sysum very likely retained some loyalty to Thurston based on his receipt of $785,000 from the Dry–Up Agreement after Thurston approved the sale and his willingness to settle the litigation against Sytech—a company that Sysum owned—for a nominal sum.

¶ 49 Second, the assertion of the privilege likely advanced the interests of both Jonathan Sysum and Thurston in the outcome of this litigation. In essence, Jonathan Sysum was "pragmatically a noncaptioned party in interest," *id.* because his role in selling, partially financing, and later devaluing the Kersey Property was integral to determining whether FIF breached fiduciary duties owed MIC when signing the Dry–Up Agreement and settling the Sytech litigation.

¶ 50 And third, Jonathan Sysum was a "key figure ... and played a controlling role," *id.* in this case because his and Sytech Development's alleged actions and misrepresentations formed the underlying facts giving rise to MIC's complaint. Indeed, the record is replete with evidence that Jonathan Sysum, acting individually and as Sytech Development, knew of and participated in the creation of the Loan and the execution of the Dry–Up Agreement.[1]

¶ 51 Under these circumstances, we have no difficulty concluding that the adverse inference which the jury was instructed it could draw against FIF based on Jonathan

---

1. As to the second *LiButti* factor, "[t]he [d]egree of [c]ontrol of the [p]arty [o]ver the [n]on-[p]arty [w]itness," we agree with FIF that there was no evidence introduced that FIF had any degree of control over Jonathan Sysum. *LiButti v. United States*, 107 F.3d 110, 123 (2d Cir. 1997). How-

ever, because we conclude the additional factors are met, and, as a result, the invocation and the adverse inference was trustworthy under all the circumstances, the lack of evidence of FIF's control over Jonathan Sysum does not lead us to a contrary conclusion.

Sysum's invocation of the Fifth Amendment privilege was "trustworthy." *Id.* at 124.

¶ 52 Turning finally to whether the court abused its discretion when it determined that this testimony would not be unfairly prejudicial to FIF, *see* CRE 403, we discern no such abuse because the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice. Evidence is probative if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Under the particular circumstances of this case, Jonathan Sysum's invocation of the privilege made it more probable that he and Thurston had acted against MIC's interests when they worked together to execute the Dry–Up Agreement.

¶ 53 In addition, because the sole question put to him was innocuous, this evidence was not unduly prejudicial in the sense of creating "an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror." *Koehn v. R.D. Werner Co.*, 809 P.2d 1045, 1048 (Colo. App. 1990); *accord Leaf v. Beihoffer*, 2014 COA 117, ¶ 27, 338 P.3d 1136.

### 2. Matthew Sysum

¶ 54 Evidence introduced at trial established that Matthew Sysum was convicted of fraud based at least in part on his forging $1,200,000 worth of presale contracts regarding the Kersey Property. However, no evidence was introduced that Thurston had any relationship with Matthew Sysum. Indeed, while the Dry–Up Agreement benefitted Matthew Sysum as an owner of Sytech Development, there was no testimony that he tried to secure, or was involved in the negotiations of, the Dry–Up Agreement. Therefore, we conclude that the trial court erred in admitting Matthew Sysum's invocation of his Fifth Amendment privilege against self-incrimination.

¶ 55 However, the court remedied this error by instructing the jury that "the jury may not draw any inference for or against ... any party to this case as a result of Matthew Sysum's assertion of his 5th Amendment Right." Because the jury was effectively told to disregard Matthew Sysum's invocation of his privilege against self-incrimination, and only the same innocuous question was put to him, we perceive no reversible error. *See Margenau v. Bowlin*, 12 P.3d 1214, 1216 (Colo. App. 2000) ("Ordinarily, curative instructions are sufficient to overcome evidentiary error, *see People v. Gillispie*, 767 P.2d 778 ([Colo. App.] 1988), and jurors are presumed to follow instructions given by the court. *Lexton–Ancira Real Estate Fund v. Heller*, 826 P.2d 819 (Colo. 1992).").

### III. Should the Trial Court or the Jury Determine the Accrual Date For Purposes of Claim Preclusion?

¶ 56 FIF further argues that on remand from *MIC I*, the trial court violated the law of the case by failing to determine whether MIC knew or should have known there was a dispute concerning the Assignment's validity or the ownership of the Kersey Property when it filed the Utah action. Determining when MIC knew or should have known about the Assignment dispute is a substantially similar inquiry to determining an accrual date for statute of limitations purposes, *see* § 13–80–108(1), C.R.S. 2014, and accrual of a claim in that context is a question for the trier of fact to resolve. *See Sterenbuch v. Goss*, 266 P.3d 428, 432 (Colo. App. 2011). Because the jury considered the issue of what MIC knew or should have known about the Assignment, we reject FIF's argument.

### A. Standard of Review

¶ 57 We review trial court compliance with prior appellate rulings de novo. *Hardesty v. Pino*, 222 P.3d 336, 339 (Colo. App. 2009). Here, as argued in FIF's trial brief:

The Court of Appeals left it to this Court to determine "whether MIC's claim of invalidity of the Assignment was an after-arising claim and thus not barred by the Utah judgment" ... by determining "whether MIC knew or should have known that there was a dispute concerning the Assignment's validity or the ownership of

the Property when it filed the Utah action." ... Defendant[s] respectfully request that, following the presentation of evidence expected to be received at trial and appropriate factual findings, the Court enter an order deeming claim preclusion to bar MIC's claim of ownership regarding the Property.

Now on appeal FIF asserts that it was error for the jury to determine this issue rather than the trial court.

## B. Law and Analysis

¶ 58 Under the mandate rule embodied in the law of the case doctrine, "[t]rial courts have no discretion to disregard binding appellate rulings: '[t]he law of the case as established by an appellate court *must be followed* in subsequent proceedings before the trial court.'" *Id.* at 340 (quoting *People v. Roybal,* 672 P.2d 1003, 1005 (Colo. 1983)). The law of the case includes conclusions on issues previously presented to an appellate court, as well as rulings logically necessary to sustain those conclusions. *Super Valu Stores, Inc. v. Dist. Court,* 906 P.2d 72, 79 (Colo. 1995); *Mitchell v. Ryder,* 104 P.3d 316, 319 (Colo. App. 2004).

¶ 59 In *MIC I,* slip op. at 11–12, the division concluded:

> Because there is a genuine issue of material fact as to whether MIC knew or should have known that there was a dispute concerning the Assignment's validity or the ownership of the Property when it filed its Utah action, we conclude that the district court erred in ruling that the doctrine of claim preclusion barred MIC's claim that the Assignment was invalid.

The division did not direct the trial court to find when MIC knew or should have known of the Assignment dispute.

¶ 60 Undaunted, FIF contends that "[f]actual findings underlying a claim preclusion or other similar issue are determined by a district court not a jury," and cites *Antelope Co. v. Mobil Rocky Mountain, Inc.,* 51 P.3d 995, 1002 (Colo. App. 2001) ("[T]he factual determination of the privity issue should be made by the court, not by the jury." (citing *Lowell Staats Mining Co. v. Phila. Elec. Co.,* 878 F.2d 1271, 1275–76 (10th Cir. 1989), and *People v. Tynan,* 701 P.2d 80, 83–84 (Colo. App. 1984))). Consequently, FIF contends that the court had to make this determination.[2]

¶ 61 "'When a cause of action accrues is a question of law, the formulation of which settles a general rule of law.'" *Sterenbuch,* 266 P.3d at 432 (quoting *Hickman v. N. Sterling Irrigation Dist.,* 748 P.2d 1349, 1350 (Colo. App. 1987)). "Once the rule is settled upon, when a particular claim accrues ... [is] ... [a] question[ ] of fact for a jury to resolve." *Id.* (emphasis added); *see Damian v. Mountain Parks Elec., Inc.,* 2012 COA 217, ¶ 8, 310 P.3d 242; *cf. Gognat v. Ellsworth,* 259 P.3d 497, 502 (Colo. 2011) (accrual date is a question of fact for the jury); *see also Coomer v. CSX Transp., Inc.,* 319 S.W.3d 366, 374 (Ky. 2010) (finding genuine issue of material fact relating to accrual of cause of action for claim preclusion and ruling that "on remand, if this case reaches trial, *the jury would be required to make a finding as to when [plaintiff] knew, or in the exercise of reasonable diligence should have known, of both his injury and its cause*") (emphasis added); *Eski v. Gai,* No. 56492-7-I, 2006 WL 1727899, at *2–3 (Wash. Ct. App. June 26, 2006) (genuine issue of material fact

---

**2.** FIF also argued to the trial court in its motion for directed verdict that MIC knew or should have known of the dispute regarding the Assignment and the ownership of the Property and, therefore, a directed verdict based on claim preclusion was appropriate. The trial court denied the motion, concluding that while both parties knew of the Assignment in 2009 (when the Utah litigation was filed), a reasonable juror could conclude that it was not until June 2010 that MIC had any reason to believe that there would be dispute over the validity of the Assignment because prior to that time Thurston had taken a position that MIC was still an owner of the Property. We perceive no error in this ruling. *See, e.g., Patterson v. BP Am. Prod. Co.,* 2015 COA 28, ¶ 36, 360 P.3d 211 ("We review de novo a district court's ruling on a motion for a directed verdict ... viewing the evidence in the light most favorable to the nonmoving party. A directed verdict is appropriate where the evidence compels the conclusion that 'reasonable jurors could not disagree' and that 'no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained.'" (quoting *Brossia v. Rick Constr., L.T.D. Liab. Co.,* 81 P.3d 1126, 1131 (Colo. App. 2003))).

remained as to when cause of action accrued for purposes of claim preclusion, and material facts are to be decided by the jury).

¶ 62 Here, because the jury was the fact finder, it was for the jury to determine whether MIC knew or should have known that there was a dispute concerning either the validity of the Assignment or the ownership of the Kersey Property when it filed the Utah action. The jury was not given a special interrogatory on this specific issue. *See* C.R.C.P. 49(b) (general verdict accompanied by answer to interrogatories); *Felder v. Union Pac. R.R. Co.*, 660 P.2d 911, 914 (Colo. App. 1982) (use of special interrogatories accompanying general verdicts is discretionary with the trial court). But the jury was given a special interrogatory asking "Did the parties intend that First Interstate Financial, LLC would be the sole owner of the Property when the assignment was executed?" And the jury replied "No."

¶ 63 When the jury answered this interrogatory in the negative, it had before it the following evidence: MIC believed that the Assignment was only a mechanism to allow FIF to pursue litigation against the appraiser; after the Assignment was executed in 2006, FIF expressed the belief through Thurston, verbally and in emails, that the Property was jointly owned; the Utah litigation was commenced in 2009; and in June 2010, FIF took the position for the first time, as reflected in a letter from its counsel that was admitted as an exhibit, that it was the sole owner of the Property.

¶ 64 Also, on appeal, counsel for FIF concedes that the only evidence establishing that MIC knew or should have known that it did not own the Property jointly with FIF is the Assignment itself and the "context" of its execution. Against the testimony that Thurston himself believed the Property was owned jointly—at least as of the date the Utah action was filed—this explanation does not persuade us that the jury's answer resolved the accrual issue incorrectly. The facts before the jury plainly established that MIC could not have known it was injured by an unfiled assignment that both signatories believed to be inoperable when it filed the Utah action.

¶ 65 Under these circumstances, because the jury determined that the Assignment was not intended to transfer MIC's interest in the Property to FIF, MIC could not have known there was a dispute over the Assignment's validity when it filed the Utah action. Similarly, when the jury determined that the Assignment was not intended to give FIF ownership of the Kersey Property, it necessarily determined that MIC could not have known there was a dispute over the ownership of the Property until FIF recorded the Assignment on October 25, 2010, three days after FIF lost the Utah litigation. Therefore, the jury properly resolved the factual issue dispositive of claim preclusion against FIF.

## IV. Did the Trial Court Allow the Relitigation of Matters Barred by Claim Preclusion?

¶ 66 FIF also contends the court erred by not appropriately ruling that claim preclusion barred MIC from relitigating matters already litigated in Utah. In its opening brief, "FIF submits it is clear from this Court's prior ruling [that] *all* aspects of the Kersey loan transaction are barred by claim preclusion other than the issue concerning the validity of the Assignment and the pursuit and settlement of the Sytech litigation." We disagree.

### A. Standard of Review

¶ 67 "Claim preclusion is sometimes a strict question of law and other times a mixed question of law and fact." *Camp Bird Colo., Inc. v. Bd. of Cnty. Comm'rs*, 215 P.3d 1277, 1281 (Colo. App. 2009). "If the facts in the case are undisputed and the question of preclusion either can be answered by review of the judgment or can be determined solely by reviewing the record, it is strictly a question of law and thus reviewed de novo." *Id.* "However, if there are disputed facts, then facts supported by reasonable evidence are given a deferential standard of review and application of the law is reviewed de novo." *Id.*

## B. Law and Analysis

¶ 68 In *MIC I*, slip op. at 11–12, the division concluded that "a genuine issue of material fact [existed] as to whether MIC knew or should have known that there was a dispute concerning the Assignment's validity or the ownership of the Property when it filed its Utah action." Because the jury, not the trial court, is responsible for this determination, *see* Part IIIB above, the court did not err in allowing evidence and argument regarding the entirety of the Kersey Loan to be presented to the jury. Claim preclusion bars " 'relitigation of matters that have already been decided [in a prior proceeding] as well as matters that could have been raised in a prior proceeding but were not.' " *Loveland Essential Grp., LLC v. Grommon Farms, Inc.*, 2012 COA 22, ¶ 14, 318 P.3d 6 (quoting *Argus Real Estate, Inc. v. E–470 Pub. Highway Auth.*, 109 P.3d 604, 608 (Colo. 2005)). "Claim preclusion bars litigation of claims that previously were or might have been decided only 'if the claims are tied by the same injury.' " *Id.* at ¶ 15 (quoting *Argus Real Estate*, 109 P.3d at 609).

¶ 69 Here, the complaint filed by MIC in Colorado requested damages for breach of fiduciary duty based on the settlement of the Sytech litigation and the recording of the Assignment. Later, MIC was allowed to assert another theory of recovery based on the Dry–Up Agreement. Neither the recording of the Assignment nor the settlement of the Sytech litigation could have been raised in the Utah litigation because they occurred after the jury returned its verdict in the Utah case. Regarding the Dry–Up Agreement, MIC's principal testified at trial that he was unaware of the Dry–Up Agreement until after the Utah litigation had been commenced. None of these injuries were litigated in the Utah action. Furthermore, FIF concedes that MIC could not have brought its claim to quiet title in the Kersey Property anywhere else since actions to quiet title must be filed in the county where the property is located. *See* C.R.C.P. 98(a) ("All actions affecting real property ... shall be tried in the county in which the subject of the action, or a substantial part thereof, is situated.").

¶ 70 FIF fundamentally misunderstands both the prior ruling in *MIC I* and the obligation of the trial court when the case was remanded. FIF argues that this court, by affirming "in all other respects" the trial court's order on summary judgment, precluded MIC from introducing evidence relevant to its claims because all "other aspects" of the litigation were barred by claim preclusion. FIF is wrong for the following two reasons.

¶ 71 First, *MIC I* affirmed the trial court's order on summary judgment concluding that (1) a genuine issue of material fact existed regarding the meaning of the Assignment; (2) the doctrine of judicial estoppel should not be applied to bar FIF from taking a position contrary to its position in the Utah litigation; and (3) FIF was precluded from asserting the defense of issue preclusion. These specific holdings of the trial court are what were affirmed in *MIC I*, not "the applicability of claim preclusion to other aspects of MIC's claims," as argued by FIF.

¶ 72 Second, *MIC I* remanded MIC's claims regarding the validity of the Assignment and ownership of the Kersey Property; all MIC did at trial was present the legal theories attending these claims—quiet title, breach of fiduciary duty, unjust enrichment, breach of oral agreement, and constructive trust. The jury returned a verdict in MIC's favor on its breach of fiduciary duty claim and, in special interrogatories, concluded the Assignment was invalid and that MIC owned one hundred percent of the Kersey Property. Because this court had remanded for the fact finder to make determinations as to these exact issues, we cannot perceive any error on the part of the trial court in allowing these claims to go to the jury.

## V. Conclusion

¶ 73 The judgment is affirmed.

Webb and Terry, JJ., concur.